# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM BARNETT,<br><br>            Plaintiff,<br><br>   v.<br><br>SOUTHERN CALIFORNIA EDISON COMPANY LONG TERM DISABILITY PLAN,<br><br>            Defendant. | Case No. 1:12-CV-00130-LJO-SAB<br><br>MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR ATTORNEY'S FEES, BENEFITS & INTEREST<br><br>(Docs. 85, 86) |

## INTRODUCTION

Plaintiff William Barnett ("Barnett") commenced this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, challenging the termination of his long-term disability benefits by Defendant Southern California Edison Long Term Disability Plan ("the Plan"). Judgment was previously entered in the Plan's favor. Doc. 55. Following Barnett's appeal, the Ninth Circuit vacated the Court's judgment and remanded for further proceedings on one issue. *Barnett v. So. Cal. Edison Co. Long Term Disability Plan*, 633 F. App'x 872 (9th Cir. 2015) (Doc. 77); Doc. 82. Upon remand, Barnett has filed a motion for attorney's fees, benefits and interest (Doc. 85) and the Plan has moved for summary judgment (Doc. 86). This matter is appropriate for resolution without oral argument. *See* E.D. Cal. Civ. L.R. 230(g). Having carefully considered the record in this case in light of the relevant law, the Court GRANTS the Plan's motion for summary judgment and GRANTS IN PART and DENIES IN PART Barnett's motion for attorney fees, benefits and interest.

**BACKGROUND**

## I.    Facts[1]

Southern California Edison Company ("Edison") provides a Long Term Disability ("LTD") Plan[2] that is "designed to provide partial income replacement to eligible full-time employees who are disabled and unable to perform their regular and customary job for the first two years of disability, and any reasonable job for the company after two years." A.R. at 3553. Edison employees participating in the Plan become eligible for LTD benefits after they have been unable to perform their regular and customary job for six continuous months. *Id.* at 3555. After two years of disability, Plan participants must be "totally disabled in order to remain eligible for benefits." *Id.*

The Plan includes the following definitions:

> **Totally disabled** means you are unable to perform any reasonable job for the company due to illness or injury. Your disability must be substantiated by medical evidence from a qualified physician specializing in the area of your disability …
> …
>
> **A reasonable job** is any gainful activity in any job classification for which you are or may reasonably become fitted by education, training, or experience. However, the meaning of "reasonable job" varies among employee groups depending on where the job is located. For employees of Southern California Edison, a reasonable job is located at any of the company within the zone (Northwestern, Basin, Eastern) in which you were working on your last day of work.

*Id.* at 3355-56 (emphasis added). Under the Plan, the Southern California Edison Company Benefits

---

[1] The following relevant facts are drawn from the Administrative Record ("A.R.," Docs. 46-52), and pertinent documents from the prior proceedings in this matter, including Plaintiff's Statement of Undisputed Facts ISO Motion for Summary Judgment ("PSUF," Doc. 15); the Declaration of Patrick Neylan ISO Defendant's Opposition to Plaintiff's Motion for Summary Adjudication ("Neylan Decl.," Doc. 23-2); the Declaration of Deborah Jacobs ISO Defendant's Opposition to Plaintiff's Motion for Summary Judgment ("Jacobs 4/29/13 Decl.," Docs. 23-3, 23-4, 23-5); Defendant's Response to PSUF ("DRPSUF," Doc. 23-6); Defendant's Statement of Undisputed Material Facts ISO Countermotion for Summary Judgment ("DSUMF," Doc. 24-7); and Plaintiff's Response to Defendant's Material Facts ("PRMF," Doc. 30).

[2] A plan document that "contains all provisions of the plan without summarization or simplification is typically called the master plan document." *Goldinger v. Datex-Ohmeda Cash Balance Plan*, 701 F. Supp. 2d 1205, 1208 (W.D. Wash. 2010). The ERISA statute requires that employers provide participants with a copy of a Summary Plan Description ("SPD"), but not the plan master document. *Bergt v. Ret. Plan for Pilots Employed by MarkAir, Inc.*, 293 F.3d 1139, 1143 (9th Cir. 2002). The SPD must describe the "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits" and shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1104(a)(1)(D); *see also Bergt*, 293 F.3d at 1143 (9th Cir. 2002) (quoting *Pisciotta v. Teledyne Indus.*, 91 F.3d 1326, 1329 (9th Cir. 1996)) (SPDs are the "'statutorily established means of informing participants of the terms of the plan and its benefits' and the employee's primary source of information regarding employment benefits."). Where there is no conflict between the SPD and the Plan's master document, as is the case here, the Court may rely upon the text of the SPD. *See id.* The SPD of the LTD Plan is located in the A.R. at 3553 to 3562.

Committee ("the Benefits Committee") "has the full and final power and discretionary authority to determine eligibility for benefits, to determine covered benefits, and to construe the terms and provisions of the plans … [and] may … [i]nterpret, construe and apply the plan provisions to decide all questions that arise." *Id.* at 3735.[3] The Benefits Committee delegated its authority to Sedgwick Claims Management Services, Inc. ("Sedgwick" or "the Administrator"), which administered the Plan's LTD claims at all relevant times. *Id.* at 104-06, 2512-29, 3729. Sedgwick has the discretion to review and evaluate all medical evidence for Plan participants and make factual determinations as to eligibility for LTD benefits. *Id.* at 3556. The contract between the Plan and Sedgwick was overseen by Deborah Jacobs ("Jacobs"), a manager in Edison's Disability Management department. Jacobs 4/29/13 Decl. ¶¶ 1-2; PRMF ¶ 15.

From 1991 until June 2000, Barnett was employed by Edison as a program manager at the San Onofre Nuclear Generating Station ("SONGS"), located at 500 Pacific Coast Highway, San Clemente, California 92674. A.R. at 1917-18, 2047-48. In June 2000, Barnett left work because he had lower back problems, which had led to surgery during the prior year. PRMF ¶¶ 1-2. Barnett was certified as disabled, and was eligible to participate in the Plan because he was unable to perform his job for six consecutive months. PRMF ¶ 3; A.R. at 904, 3553.

A letter from the Plan, dated March 13, 2001, informed Barnett that his application for LTD benefits had been approved effective December 20, 2000. A.R. at 1244-45. The letter provided, in relevant part:

> You will continue to qualify for LTD benefits providing you remain totally disabled, which is defined as unable to perform any reasonable job for the Company. Periodically, you will be required to submit medical evidence of your total disability status. This may include a physical examination by a doctor of the Company's choice – one who specializes in the area of your disability.

*Id.* at 1244.

In July 2009, based upon its review of Barnett's medical records, the Plan exercised its right to certify Barnett's eligibility for LTD benefits by having him undergo an independent medical examination by Dr. Aubrey A. Swartz, an orthopedic surgeon. PRMF ¶ 17; Neylan Decl. ¶ 3. Dr.

---

[3] Information about the Plan's administration is located in the A.R. at 3717-3752.

Swartz prepared an Independent Medical Evaluation detailing Barnett's medical condition that was subsequently forwarded to John C. Meyers, a vocational rehabilitation consultant, who prepared a Transferable Skills Analysis ("TSA") report, dated August 2, 2009. Neylan Decl. ¶ 4; A.R. at 1563-73 (copy of Dr. Swartz's report); A.R. at 1607-11 (copy of Meyers's TSA report). According to the referral letter, Sedgwick requested a TSA report to help "make a determination as to whether [Barnett] would be eligible for continuing LTD benefits … [meaning that he] must be unable to perform in any occupation as it may be performed within their company based on certain criteria that will ultimately be evaluated by [Edison]." A.R. at 1607. After reviewing Barnett's medical condition and possible work accommodations, and comparing Edison's "library of job descriptions" to Barnett's profile, the TSA concluded Barnett could "reasonably become fitted to perform the following occupation: Customer Specialist 1." *Id.* Additionally, "[w]ith an adjustable work station which can be raised or lowered … [Barnett] could perform other office occupations such as Telephone Operator, Joint Pole Clerk and Administrative Aide." *Id.*

In a letter dated August 26, 2009, Sedgwick informed Barnett that it had determined that he was no longer eligible for LTD benefits. *Id.* at 606-09. The letter explained that pursuant to Dr. Swartz's report, Barnett had "a permanent incapacity that would require permanent work restrictions," and the TSA, taking into consideration these work restrictions, as well as Barnett's training, education, and experience, concluded that Barnett was capable of performing the positions of Customer Specialist 1, Telephone Operator, Joint Pole Clerk, or Administrative Aide at Edison. *Id.* at 608-09. Thus, as Barnett was no longer "precluded from performing any reasonable job at [Edison] … [he] no longer [met] the definition of disability." *Id.* at 609. Finally, the letter noted that Barnett's LTD benefits claim would be terminated effective October 1, 2009, and apprised him of his right to appeal the decision. *Id.*

On November 16, 2009, Barnett formally appealed the termination of his benefits. *Id.* at 1320-21. As part of the appeals process, a panel of six doctors reviewed Barnett's medical records, and Sedgwick requested that Myers prepare a supplemental TSA report, which compared the updated information on Barnett's medical condition with Edison's library of job descriptions. *Id.* at 1043-45. The updated TSA, dated March 30, 2010, found that Barnett could "reasonably become

4

1   fitted to perform" two occupations: Customer Service Specialist 1 and Telephone Operator. *Id.* at

2   1045.

3           On March 29, 2010, Dorene Barker ("Barker"), an Appeals Specialist with Sedgwick

4   emailed Bob Kowal, who was at SONGS, to see if SONGS could accommodate Barnett's work

5   restrictions. *Id.* at 1352. At some point, it was confirmed that SONGS could accommodate

6   Barnett's work restrictions, but a job was not immediately available at that time. *Id.* at 1356. In an

7   email dated April 5, 2010, Jacobs informed Barker that the statement that SONGS could

8   accommodate Barnett could be used as a basis to find that Barnett was no longer disabled, under the

9   Plan. *Id.* Jacobs further wrote, "[t]he letter does not need to mention anything about job availability

10  – but maybe modify it a bit to not say he is expected to report back to work right away and just that

11  he needs to contact his work location about his return to work." *Id.* Barker subsequently prepared a

12  letter upholding the denial of Barnett's LTD benefits. *Id.*

13          In a letter dated April 7, 2010, Sedgwick denied Barnett's appeal. *Id.* at 766-69. The letter

14  noted the TSA's finding that Barnett could reasonably become fitted to perform the positions of

15  Customer Specialist 1 and Telephone Operator, and that "it was confirmed that Mr. Barnett's

16  restrictions could be accommodated by his work location." *Id.* at 768. The letter continued: "Based

17  on the Independent Medical Examination, the [TSA], the Panel Reviews and the medical

18  documentation in Mr. Barnett's file, the objective medical evidence failed to support an impairment

19  that precluded him from performing 'any reasonable job' at Edison International as of October 1,

20  2009." *Id.* at 769. The letter concluded that because Barnett was no longer precluded from

21  performing any "reasonable job" with Edison, and was no longer eligible to receive LTD benefits,

22  the denial of his LTD benefits was in accordance with the Plan. *Id.* Finally, the letter apprised

23  Barnett of his right to file a civil action under ERISA § 502(a). *Id.*

24  **II.    Procedural History**

25          Barnett filed the original complaint in this case on January 27, 2012, alleging three causes

26  of action under ERISA. Doc. 1. The first cause of action sought to bar the Plan from relying upon

27  the 180-day contractual limitation as a defense against the suit; the second cause of action alleged

28  that the Plan denied Barnett a full and fair review of his claim; and the third cause of action sought

equitable relief on account of the Plan's alleged failure to provide Barnett a full and fair review of his claim. *See id*. The Court granted summary judgment in favor of Barnett on the first cause of action, and permitted the second and third causes of action to proceed to trial. Doc. 34 at 19.

In a Pre-Trial Conference Order on July 8, 2013, the Court dismissed Barnett's third cause of action because it determined that this claim was a "repackaged version of his second cause of action." Doc. 38 at 1-2. At the Pre-Trial Conference held on July 11, 2013, the parties agreed to forego trial and submit briefs on the one remaining issue of whether, based solely on review of the administrative record, the Plan abused its discretion by terminating Barnett's LTD benefits. Doc. 40 at 15.

In Barnett's reply brief, he raised for the first time the argument that there was no evidence in the record regarding the "zone" in which he worked or that the two jobs identified by Myers in the TSA were in that "zone." Plaintiff's Response to Defendant's Undisputed Material Facts and Supporting Evidence ("PRSSUMF") ¶¶ 14-15; Doc. 53 at 5. Barnett's reply brief was the last brief submitted before the Court rendered its first decision in this case. *Id.*

On August 26, 2013, the Court issued a memorandum decision finding that the Plan did not abuse its discretion in terminating Barnett's LTD benefits, and entered judgment in favor of the Plan. Docs. 55, 56. This judgment did not address the "zone" issue.[4]

Barnett filed a notice of appeal on September 9, 2013. Doc. 59. On appeal, Barnett made, *inter alia*, the following arguments: (1) that his LTD benefits could not be terminated unless and until he was offered a job by Edison; (2) Sedgwick abused its discretion when it determined that there was a reasonable job Barnett could perform; and (3) Sedgwick abused its discretion when it implicitly determined that the reasonable job was within the proper "zone." *See* Doc. 77.

On November 2, 2015, the Ninth Circuit issued an order directing both parties to file supplemental briefs addressing "whether there is evidence in the record to support a determination that a job Barnett could perform was 'within the zone (Northwestern, Basin, or Eastern) in which [he was] working on [his] last day of work.'" Doc. 85-2, Ex. 4. The Plan argued that Sedgwick

---

[4] "The district court need not consider arguments raised for the first time in a reply brief." *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007); *see also Tovar v. U.S. Postal Serv.*, 3 F.3d 1271, 1273 n.3 (9th Cir. 1993) ("To the extent that the [reply] brief presents new information, it is improper. Therefore, [certain] portions of the brief are ordered stricken [.]").

specifically noted that at the appeals denial stage, it determined that that SONGS could accommodate Barnett's work restrictions and thus, he would be able to work at the same location he worked at previously, and that a job at SONGS would be "within the same zone in which he was working at the time of disability." *Id.*, Ex. 5. Barnett pointed out that the administrative record contained no mention of the "zone" in which Barnett last worked, and thus, it is impossible for the Plan to prove that the Customer Service Specialist 1 and Telephone Operator positions identified by Myers in the TSA were within the "zone" in which Barnett last worked. *Id.*, Ex. 6.

In its memorandum decision and order, dated December 7, 2015, the Ninth Circuit found as follows:

> After our careful review of the record, we are unable to say that the Administrator abused its discretion when it determined that there was a reasonable job that Barnett could perform. However, the Administrator did abuse its discretion when it implicitly determined that the job in question was within the proper zone. Simply put, there was no evidence of the zone in which the reasonable job was located, nor was there explicit evidence of the zone in which Barnett worked. As a result, the termination of benefits was improper and we must vacate the district court's determination and remand for further proceedings.

*Id.* at 5. The mandate of the Ninth Circuit issued on December 30, 2015. Doc. 79.

On January 25, 2016, this Court requested clarification "as to whether the 'further proceedings' called for in the Ninth Circuit's opinion are limited to calculating back-benefits and fees, or alternatively, whether augmentation of the record is permitted on the merits of the 'zone' issue." Doc. 81. The Ninth Circuit responded:

> (1) As the district court indicated, we upheld its prior rulings with the exception of the zone ruling. Our disposition and mandate were not intended to restrict the district court's sound discretion and judgment as to the handling of any remaining issues presented by the parties as the case proceeds.

> (2) We note, in particular, that we do not intend to indicate that the district court may not give further consideration to the zone issue, which may include remand to the Plan Administrator for further exercise of its discretion regarding construction of the Plan document and further explication of its decision in light of that construction, if the district court deems that necessary or appropriate in light of the presentation by the parties.

Doc. 82, at 1-2.

On February 26, 2016, the parties filed a joint status report regarding the nature and extent of any necessary further proceedings, in which they submitted that cross-motions for summary judgment regarding the "zone" issue are necessary to resolve this case. Doc. 84.

Barnett filed his motion for attorney's fees, benefits and interest (Doc. 85), which contains a motion for summary judgment,[5] on March 21, 2016; the Plan cross-moved for summary judgment the same day (Doc. 86). Oppositions were filed April 4, 2016 (Docs. 87, 88), and Barnett filed a reply on April 11, 2016 (Doc. 89).

## SUMMARY JUDGMENT ON THE ZONE ISSUE

### I.    Standard of Review

"Traditional summary judgment principles have limited application in ERISA cases governed by the abuse of discretion standard." *Sephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 929 (9th Cir. 2012) (citing *Nolan v. Heald College*, 551 F.3d 1148, 1154 (9th Cir. 2009)). Where "the abuse of discretion [standard] applies in an ERISA benefits denial cases, a motion for summary judgment is, in most respects, merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Id.* (internal citation and quotation marks omitted); *see also Gilliam v. Nevada Power Co.*, 488 F.3d 1189, 1192 n.3 (9th Cir. 2007) (internal citation omitted). "Thus, a summary judgment motion resting on the administrative record is not a typical summary judgment, but rather, is a procedural vehicle for determining whether benefits were properly granted or denied." *Nalbandian v. Lockheed Martin Corp.*, No. 10-cv-1242-LHK, 2011 WL 3881473, at *5 (N. D. Cal. Sept. 1, 2011).

Here, as both parties have moved for summary judgment, the Court must consider each motion on its own merits, and "must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous. Council of Riverside Cty.*, *Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001). The court also must "rule[] on each party's motion on an individual and separate basis,

---

[5] Barnett's motion, although styled as and containing a motion for attorney's fees, benefits, and interest, also requests summary judgment in his favor on the zone issue. *See* Doc. 87 at 1 (acknowledging that Barnett's motion seeks summary judgment on this issue).

1   determining for each side, whether a judgment may be entered in accordance with the Rule 56

2   standard." *Tulalip Tribes of Wash. v. Wash.*, 783 F.3d 1151, 1156 (9th Cir. 2015)

3   **II.    Analysis**

4       **a.   Augmentation of the Record Following Remand**

5          The Plan offers extrinsic evidence for the Court's consideration on remand—specifically,

6   testimonial and documentary evidence from Jacobs as to how Edison determined zones under the

7   Plan and how Edison determined the zone for SONGS employees; and documentary evidence from

8   Lorie Obal, a senior business analyst at Edison, demonstrating that Customer Specialist I and

9   Telephone Operator positions existed at Edison in a certain zone during the relevant times.[6]  In

10  ERISA cases applying the abuse of discretion[7] standard, the district court is generally confined to

11  the evidentiary record before the plan administrator and may not consider extrinsic evidence. *Abatie*

12  *v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 970 (9th Cir. 2006) (en banc). While there are some

13  exceptions to this general rule, *see id*. at 972-73, neither the Plan nor Barnett has objected to

14  augmentation of the record in this case. In fact, both parties premise their legal arguments upon the

15  Plan's newly submitted evidence. *See* Doc. 85-1 at 6-7; Doc. 86-1 at 7-17. The parties have

16  therefore waived any objection they may have to the Court's consideration of this evidence. *See*

17  *FDIC v. Garner*, 126 F.3d 1138, 1145, (9th Cir. 1997) (finding that the failure to present any

18  argument or pertinent authority waives the argument); *accord Pelfresne v. Village of Williams Bay*,

19  917 F.2d 1017, 1023 (7th Cir. 1990) ("A litigant who fails to press a point by supporting it with

20  pertinent authority, or by showing why it is sound despite a lack of supporting authority… forfeits

21  the point. We will not do his research for him."). For these reasons, the Court will treat the Plan's

22  extrinsic evidence as if it were part of the original administrative record in this case. *See Abatie*,

23  458 F.3d at 972-73.

24  //

25  ---

26  [6] *See* Declaration of Deborah Jacobs ISO Defendant's Motion For Summary Judgment Following Appeal ("Jacobs 3/18/16 Decl."), Doc. 86-2, true and correct copies of further email communications between Sedgwick and Edison employees as to Barnett's appeal (Jacobs 3/18/16 Decl., Ex. 2); Declaration of Lorie Obal ISO Defendant's Motion for Summary Judgment Following Appeal ("Obal Decl."), Doc. 86-3, Exs. 4-5.

27  [7] The Ninth Circuit's decision noted that the Court was correct in applying the abuse of discretion standard in the earlier proceedings. Doc. 77 at 2

28

b.  **The Law of the Case and Rule of Mandate**

A key undisputed fact in this case is that SONGS, the location at which Barnett last worked, "is unique among [Edison] jobsites in that it sits on land leased from Camp Pendleton and as such is located on a federal enclave." *See* Doc. 85-1 at 1; Doc. 86-1, at 5; PRSSUF ¶ 39. SONGS is therefore not technically part of any Edison service territory. Jacobs 3/18/16 Decl. ¶ 8. Included as an exhibit to Jacobs's declaration is a map entitled "Disability Program Geographic Zones," which indicates that it is used by Edison's LTD Plan and depicts three "zones" in the Southern California area: Northern, Eastern, and Central. Jacobs 3/18/16 Decl., Ex. 3. The map does not indicate the location of SONGS. *See id.* The Plan advances two possible ways to interpret the zone issue in light of its admission that SONGS is not depicted on the map and does not technically belong to a zone. Doc. 86-1 at 8. First, the Plan argues that "a position existing in a contiguous geographic zone would meet the zone requirement for employees at SONGS." *Id.* Second, the Plan argues that "a job that exists at [Barnett]'s own former work location would be considered within the same zone in which he was working on the date of disability." *Id.* at 9.

Barnett contends that the Plan's post-remand interpretations of the zone issue are impermissible under the rule of mandate and law of the case doctrines. Doc. 85-1 at 5-6 (citing *Hall v. City of Los Angeles*, 697 F.3d 1059, 1067 (9th Cir. 2012), and *United States v. Thrasher*, 483 F.3d 977, 982 (9th Cir. 2000)). In light of the Plan's admission that SONGS does not technically belong to a zone, Barnett submits that the jobs in question are thus *not* in the zone in which he last worked, by a literal reading of the word. *Id.* Barnett argues that the Ninth Circuit's mandate "does not permit [the Plan] to change its theory of the case and argue that it is not necessary to prove that Barnett was in a specific zone" and then interpret the plan "to eliminate the need to place Barnett within one of the three company zones." *Id.* at 7; Doc. 89 at 6-7.

The Court disagrees with Barnett's law of the case and rule of mandate argument as precluding the Plan from setting forth its new legal theories following remand. "The law of the case doctrine … generally precludes a court from reconsidering an issue decided previously by the same court or by a higher court in the identical case." *Hall*, 697 F.3d at 1067. "The issue in question must have been decided explicitly or by necessary implication in the previous disposition." *Id.* The aim

10

of the law of the case doctrine is to promote consistency, finality, and efficiency. *Thrasher*, 483

F.3d at 982. A related doctrine, the rule of mandate, shares these goals and serves to limit "the

district court's 'authority' on remand," and obligates the district court to carry the higher court's

order "into execution according to the mandate." *Id*. However, the district court "may consider and

decide any matters left open by the mandate of [the higher court]." *Id.* (quoting *In re Sanford Fork*

*& Tool Co.*, 160 U.S. 247, 255-56 (1895)); *see also United States v. Kellington*, 217 F.3d 1084,

1092-93 (9th Cir. 2000) ("In construing a mandate, the lower court may consider the opinion the

mandate purports to enforce as well as the procedural posture and substantive law from which it

arises").

Here, the parameters of the law of the case and the rule of mandate now before the Court are

set forth clearly in the Ninth Circuit's memorandum decision vacating and remanding the judgment

in favor of the Plan (Doc. 77), and its subsequent clarification order (Doc. 82). The Ninth Circuit's

decision held that Sedgwick abused its discretion "when it implicitly determined that the job in

question was within the proper zone," as there was "no evidence of the zone in which the

reasonable job was located, nor was there explicit evidence of the zone in which Barnett worked."

Doc. 77 at 4. In its clarification request, the Court specifically inquired as to whether further

proceedings were either "limited to calculating back-benefits and fees, *or, alternatively*, whether

augmentation of the record is permitted on the merits of the 'zone' issue." Doc. 81 at 2 (emphasis

added). The Ninth Circuit responded by expressly permitting the Court to "give further

consideration to the zone issue," (Doc. 82 at 2), and noted that its "disposition and mandate were

not intended to restrict the district court's sound discretion and judgment as to the handling of any

remaining issues presented by the parties as the case proceeds." *Id.* The Ninth Circuit also noted in

particular that it did not intend to indicate that the Court could not give further consideration to the

zone issue. Doc. 82 at 2.

When considered collectively, the Ninth Circuit's opinion only addresses the quantum of

proof present in the then-existing record and the clarification order permits the Court to resolve the

zone issue by considering the Plan's arguments and evidence on remand concerning the issue. The

Plan's new arguments following remand concerning the zone issue are therefore not foreclosed by

11

the law of the case doctrine or the rule of mandate, because the only issue explicitly decided by the Ninth Circuit is that Sedgwick's implicit determination that the jobs were within the zone where Barnett last worked was unsupported by the administrative record before the Court. *See* Doc. 77 at 4. Accordingly, the Ninth Circuit's decision permits further factual development as to the zone issue on remand and allows the Court to consider the Plan's submitted evidence and its argument that this evidence provides a reasonable basis for the termination of Barnett's LTD benefits. The Court must now determine whether the reasonable jobs Barnett was capable of performing were within the zone in which he last worked.

### c. Whether There Were Customer Service Specialist I and Telephone Operator Positions[8] in the Zone Where Barnett Last Worked

"When reviewing interpretive challenges for abuse of discretion, the Court closely reads contested terms and 'appl[ies] contract principles derived from state law [,] … guided by the policies expressed in ERISA and other federal labor laws.'" *Tapley v. Locals 302 and 612 of Intern. Union of Operating Engineers-Employers Const. Indus. Ret. Plan*, 728 F.3d 1134, 1140 (9th Cir. 2013) (quoting *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 985 (9th Cir. 1997)). Under the abuse of discretion standard, "the decision of an administrator will not be disturbed unless the court determines that the decision was arbitrary or capricious." *Horn v. Provident Life & Acc. Ins. Co.*, 351 F. Supp. 2d 954, 958 (N.D. Cal. 2004) (citing *McKenzie v. General Tel. Co. of Cal.*, 41 F.3d 1310, 1316 (9th Cir. 1994) and *Clark v. Wash. Teamsters Welfare Trust*, 8 F.3d 1429, 1431 (9th Cir. 1993)). "The touchstone of 'arbitrary and capricious' conduct is unreasonableness." *Clark*, 8 F.3d at 1432. An ERISA plan administrator's decision will be upheld if it is grounded "'in *any* reasonable basis.'" *Pac. Shores Hosp. v. United Behavioral Health*, 764 F.3d 1030, 1041-42 (9th Cir. 2014) (emphasis in original) (quoting *Horan v. Kaiser Steel Ret. Plan*, 947 F.2d 1412, 1417 (9th Cir. 1991); *see also Conkright v. Frommert*, 559 U.S. 506, 521 (2010) (internal citations omitted) ("Applying a deferential standard of review does not mean that the plan administrator will prevail on the merits. It means only that the plan administrator's interpretation

---

[8] The Ninth Circuit upheld the Administrator's determination that it was entitled to rely on Myers' TSA report, which found that Barnett was able to perform the positions of Customer Specialist I and Telephone Operator. Doc. 77 at 4.

1   will not be disturbed if reasonable."). On the other hand, "ERISA plan administrators 'abuse their

2   discretion if they render decisions without any explanation, … construe provisions of the plan in a

3   way that conflicts with the plain language of the plan' or 'rel[y] on clearly erroneous findings of

4   fact.'" *Day v. AT&T Disability Income Plan*, 698 F.3d 1091, 1096 (9th Cir. 2012) (quoting *Taft v.*

5   *Equitable Life Assurance Soc'y*, 9 F.3d 1469, 1472-73 (9th Cir. 1994)); *see also Salomaa v. Honda*

6   *Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011) (finding that the plan administrator

7   abused its discretion where its decision "was illogical, implausible, and without support in

8   inference that could reasonably be drawn from facts in the record"). Finally, the doctrine of *contra*

9   *proferentem*, which provides that "ambiguities are to be construed unfavorably to the drafter,"

10  Black's Law Dictionary 377 (9th ed. 2009), "does not apply when a plan 'grants the administrator

11  discretion to construe its terms.'" *Day*, 698 F.3d at 1098 (citing *Blankenship v. Liberty Life Assur.*

12  *Co. of Boston*, 486 F.3d 620, 625 (9th Cir. 2007)).

13      The Plan first argues that the existence of Customer Service Specialist I and Telephone

14  Operator positions in the "Central zone"[9] at the relevant times constitutes a sufficiently "reasonable

15  basis" to sustain Sedgwick's termination of Barnett's LTD benefits. *Conkright*, 559 U.S. at 521. In

16  support of this Central zone argument, the Plan has submitted the following evidence, in the form

17  of a sworn declaration from Jacobs, who oversaw the day-to-day administration for the Plan,

18  attesting that:

19      1)  "[f]or purposes of determining 'zones' under the Plan, [Edison] relied in part on

20          the Utility Workers Union of America ('UWUA') map of 'Disability Program

21          Geographic Zones,'" which references a "Northern" zone, an "Eastern" zone, and

22          a "Central" zone;

23      2)  the "Central" zone covers Los Angeles and surrounding areas, extending south to

24          El Toro, and includes Rosemead and Long Beach;

25      3)  SONGS "is not pictured on the zone map because it is technically not part of

26          [Edison] service territory, by virtue of sitting on a federal enclave";

27  _____

28  [9]Although the Plan's language only lists three putative zones (Northwestern, Basin, Eastern), the Plan's language does not appear to exclude the possibility of unlisted "zones." *See* A.R. at 3356. Rather, the listing of the Northwestern, Basin, and Eastern zones merely serve as examples, rather than an exhaustive list of all possible zones. Accordingly, the Plan's language does not preclude the "Central zone" theory

13

4) "in practice, SONGS employees were treated as being part of the Central zone as it

is contiguous with SONGS and is the zone closest to the SONGS location."

Jacobs 3/18/16 Decl. ¶¶ 7-9. The Plan then points out that Customer Specialist I and Telephone Operator positions existed within the Central zone at locations within approximately sixty miles from SONGS at the times relevant to the decision to terminate Barnett's benefits and the appeal. Doc. 86-1 at 8-9. Specifically, the Plan highlights a Customer Specialist I position located in Long Beach, approximately 52.5 miles away from SONGS, and a Telephone Operator position located in Rosemead, approximately 67 miles away from SONGS. *Id.* at 13.[10]

The Court finds this to be a reasonable interpretation supported by the augmented Administrative Record. *See Wells v. Reliance Standard Life Ins. Co.*, 285 F. App'x 343, 344-45 (9th Cir. 2008) (there is no abuse of discretion "where there is substantial evidence to support the decision, that is, where there is 'relevant evidence [that] reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence."). As the Ninth Circuit's determination in this case has already demonstrated, the "zone" provision of the "reasonable job" definition protects LTD beneficiaries from being cut off from benefits without some assurance that a job he or she is capable of performing exists in the same general geographic region as where he or she formerly worked (*see* Doc. 77 at 4), because the Administrator must make a determination that a job the beneficiary could perform is in fact in the same zone in which he or she previously worked. The Plan's extrinsic evidence makes it clear that SONGS is within an appropriate geographic proximity of the Central zone. Jacobs 3/18/16 Decl. ¶¶ 7-9. According to the zone map, which includes a scale indicating the proportional distance in miles, it is indisputable that two points within 60 miles of each other could plausibly both be located within the Central zone. *See* Jacobs 3/18/16 Decl., Ex. 3. Thus, as a matter of practicality, the geographic proximity of SONGS to the Central zone suffices for the Court to find that jobs in the Central zone, located within approximately 60 miles of SONGS, can satisfy the zone provision of the "reasonable job" requirement, and provide a "reasonable basis" for Sedgwick to conclude

---

[10] The Court may take judicial notice of these facts, as they concern geographic locations. *See EduMoz, LLC v. Republic of Mozambique*, 968 F. Supp. 2d 1041, 1048 (C.D. Cal. 2013).

that SONGS is, for Barnett's purposes, within the Central zone and that the termination of Barnett's benefits was therefore proper. *Conkright*, 559 U.S. at 521.

The Plan's Central zone theory is also supported by the dictionary definition of "zone," which the Court may consult to aid in its interpretation of ERISA plans. *Vaught v. Scottsdale Healthcare Corp. Health Plan*, 546 F.3d 620, 628 (9th Cir. 2008) (citing *Gilliam*, 488 F.3d at 1194) (instructing courts "look to the dictionary definition to determine the ordinary and popular meaning" if the ERISA plan instrument does not define a term because "terms in an ERISA plan should be interpreted in an ordinary and popular sense as would a person of average intelligence and experience"). The dictionary definition of "zone" is "one of the sections or divisions of an area or territory created for a particular purpose." Webster's Third New International Dictionary 2660 (2002).The Plan's Central zone argument thus comports with the dictionary definition of "zone," in that the Plan's zones appear "to be created for a particular purpose"— to aid in the determination of whether or not a "reasonable job" exists. A.R. at 3356 ("a reasonable job is located at any company within the zone … in which you were working on your last day at work.").

Moreover, SONGS *must* belong to a zone, and it is reasonable to find that SONGS employees are treated as belonging to the Central zone because the zones appear to be drawn in relation to geographic proximity. *See* Jacobs 3/18/16 Decl., Ex. 3. Although SONGS is not pictured on the map that Edison used to draw the zone boundaries, it must nevertheless belong to a zone for purposes of determining whether a reasonable job exists. In this regard, the Court finds persuasive the Plan's reasoning that if SONGS is deemed zone-less, much of the Plan document would be rendered "completely irrelevant as applied to SONGS employees," as it would mean that "a SONGS employee could be 100% healthy, there could be an existing and *even available* job for that person to go back to … yet they would remain on disability." Doc. 86-1 at 9-10. For this reason, the Court disagrees with Barnett's literal interpretation of SONGS not being pictured on the UWUA map as meaning that SONGS cannot belong to a zone. Doc. 87 at 6; Doc. 89 at 5. Such an interpretation would render nugatory the whole definition of "reasonable job" for SONGS employees. *See Gilliam*, 488 F.3d at 1194; *accord Helms v. Monsanto Co., Inc.*, 728 F.2d 1416 (11th Cir. 1984) (arbitrator's literal interpretation of "total disability" as absolute helplessness was

contrary to common sense and "would render the entire [disability plan] totally meaningless" because it would deny benefits to anyone alive and conscious). Barnett's proposed interpretation also runs counter to the purpose of ERISA, which represents "a careful balancing between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans." *Conkright*, 559 U.S. at 517 (internal citations omitted). Interpreting the Plan in the manner Barnett suggests would permit employees to stay on disability benefits perennially even if they are no longer disabled, which could ultimately have the effect of dissuading employers from providing disability plans. *See id.* (quoting *Vanity Corp. v. Howe*, 516 U.S. 489, 497 (1996)) ("Congress sought 'to create a system that is [not] so complex that administrative costs, or litigation expenses, unduly discourage employers from offering [ERISA] plans in the first place."); *see also Parker v. BankAmerica Corp.*, 50 F.3d 757, 766 (9th Cir. 1995) ("We reasoned that one of the goals of ERISA was to keep plan expenses within reason.").

Finally, the Court notes that because the Plan's Benefits Committee and the Administrator have "the full and final power and discretionary authority to determine eligibility for benefits … and to construe the terms and provisions of the plans" (A.R. at 3723), the doctrine of *contra proferentem* does not apply in this case. *See Day*, 698 F.3d at 1097-9. As such, any ambiguity with regard to the term zone need not be construed against the Plan, and the Court may find that the Plan's Central zone interpretation is reasonable. *See id.* (an administrator's interpretation of ambiguous term was reasonable, in part, because *contra proferentem* did not apply).

Accordingly, the Court rejects Barnett's remaining counter-arguments. One such argument is that the Plan's evidence is insufficient to demonstrate that the Plan actually engaged in a practice of treating SONGS employees as belonging to the Central zone. Specifically, Barnett points out Jacobs's statement that she "did not get involved in the claims processing with respect to individual claimants," and that there is no evidence in the record demonstrating that Sedgwick personnel were trained to treat SONGS employees, and that there are no other examples of SONGS employees being treated as Central zone employees. *See* Doc. 87 at 10; Doc. 89 at 3-6. The cases cited by Barnett to support this argument—*Mobile Exploration & Producing US, Inc. v. Cajun Construction Servs., Inc.*, 45 F.3d 96 (5th Cir. 1995); *Becker v. ARCO Chemical Co.*, 207 F.3d 176 (3d Cir.

16

2000); *Camfield v. City of Oklahoma City*, 248 F.3d 1214 (10th Cir. 2001); *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261 (11th Cir. 2008)—are not only non-binding authority, but are completely inapposite because none of them speaks to what a court evaluates in the summary judgment context for an ERISA case. These cases address how many instances of a specific occurrence may support a finding or inference that such an occurrence is a routine practice within the meaning of Federal Rule of Evidence 406. However, here, the question before the Court is not whether the Plan has furnished sufficient evidence of multiple instances where SONGS employees were treated as Central zone employees, or whether there is evidence that Sedgwick personnel were aware of this practice, but rather, whether Sedgwick's determination to terminate Barnett's benefits had "rational justifications." *See Tapley*, 728 F.3d at 1139-40 (9th Cir. 2013). The Plan has provided documentary and testimonial evidence that it treated SONGS employees as belonging to the Central zone. *See* Jacobs 3/18/16 Decl. Thus, the Plan has provided "rational justifications" for its interpretation of "reasonable job" and its termination of Barnett's benefits. *Pac. Shores Hosp.*, 764 F.3d at 1041-42 ("Pursuant to the deferential abuse of discretion standard, '*any* reasonable basis' will suffice to uphold a plan administrator's determination.") (emphasis in original).

Nor is the Court persuaded by Barnett's argument that the Plan's Central zone theory is unreasonable as a matter of law because it is a "secret interpretation" that was "never disclosed to claimants," and "likely never disclosed to or known by [Sedgwick]." *See* Doc. 87 at 10-11. Barnett premises this argument on the Ninth Circuit's decision in *Blau v. Del Monte Corp.*, 748 F.2d 1348 (9th Cir. 1984). In *Blau*, the Ninth Circuit held that the district court erred in finding that the denial of severance benefits to plaintiffs was not arbitrary and capricious. *Id.* at 1350. The administrator in *Blau* "made no attempt to comply with any of the duties that ERISA places upon a benefit plan administrator" when it made the decision to deny severance benefits to the plaintiffs, but instead, "actively concealed" its Severance Allowance Policy in violation of ERISA's reporting and disclosure requirements. *Id.* at 1350-52. In an attempt to justify its secrecy, the defendant claimed "that its secret purpose behind its secret severance benefit policy was to benefit only those employees who were without a job of any kind after termination." *Id.* at 1355. The Ninth Circuit rejected this explanation and "decline[d] to refer to the secret intent behind a secret plan to

determine whether the denial of severance benefits in this case was not arbitrary and capricious" because "[a]llowing reference to this factor would only encourage violation of ERISA's reporting and disclosure requirements, in the hope of later being able to interpret the policy through the cost-benefit analysis of hindsight." *Id.*

*Blau* is factually and legally distinguishable. The defendants in *Blau* flagrantly violated ERISA requirements when deciding to deny benefits, as "[t]he undisputed facts show that defendants failed to comply with virtually every applicable mandate of ERISA." *Id.* at 1153. Not only was the defendants' Separation Allowance Policy secret, but it was also not subject to any claims procedure, there was no Summary Plan Description, and there was "no provision to inform participants in writing of anything." *Id.* Here, the Plan provided a Summary Plan Description, and Sedgwick followed a clear claims procedure and provided notice in writing as to the reasons for its determination. Furthermore, nothing in this case indicates that the Plan "actively concealed" any information. The fact that evidence about SONGS employees being treated as Central zone employees did not surface until this juncture in the proceedings does not mean that this evidence is a secret that the Plan deliberately withheld. Barnett did not raise any argument pertaining to the zone issue until his reply in support of his summary judgment motion, which was the last brief submitted before this Court rendered its first decision in this case. PRSSUF ¶14-15. Additionally, the word "zone" is absent from the transcripts of the depositions of Jacobs and Sedgwick Operations Manager Patrick Neylan[11] taken by Barnett's counsel on December 13, 2012 in connection with the prior proceedings. Declaration of Demery Ryan ISO Defendant's Opposition to Plaintiff's Motion ("Ryan Decl."), Doc. 88-2, ¶¶ 3-4; Ryan Decl., Exs. A, B. It is therefore unwarranted for Barnett to accuse the Plan of secrecy when he did not raise the zone issue until he filed his reply brief, and did not ask Neylan or Jacobs any questions about the Plan's zones when he had the opportunity to do so during their depositions. *See Safavi v. SBC Disability Income Plan*, 493 F. Supp. 2d 1107, 1118 (C.D. Cal. 2007) (quoting *Gallo v. Amoco Corp.*, 102 F.3d 918 (7th Cir. 1996) ("the requirement under ERISA that the plan administrator give 'specific reasons' for the denial 'is not the same thing as the reasoning behind the reasons.'")).

---

[11] Doc. 86-5 ¶ 1.

For these reasons, the Court concludes that the existence of Customer Service Specialist I and Telephone Operator positions in the Central zone provides a reasonable basis to support Sedgwick's termination of Barnett's benefits. *See Pac. Shores Hosp.*, 764 F.3d at 1041-42; *Clark,* 8 F.3d at 1432 (the Court's inquiry "is not into whose interpretation of the evidence is most persuasive, but whether the plan administrator's interpretation is unreasonable"). As a result, and in light of the augmented administrative record, the termination of Barnett's benefits was not an abuse of discretion, and the Court need not consider the Plan's alternative theory regarding the ability of SONGS to accommodate Barnett's work restrictions. *See Patterson v. Shumate*, 504 U.S. 753, 765-66 (1992). The Court therefore GRANTS the Plan's motion for summary judgment and DENIES Barnett's motion on the zone issue.

### d. Reinstatement of Back Benefits

In *Pannebecker v. Liberty Life Assurance Co. of Boston*, the Ninth Circuit set forth the guidelines for determining when an ERISA beneficiary may receive back benefits. 542 F.3d 1213, 1220-22 (9th Cir. 2008). If the administrator's initial denial of benefits was "premised on the failure to apply plan provisions properly, [the court must] remand to the administrator to apply the terms correctly in the first place." *Id.* at 1221 (citing *Saffle v. Sierra Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 460-61 (9th Cir. 1996), which ordered a remand when an ERISA administrator "misconstrued the Plan and applied a wrong standard to a benefits determination."). On the other hand, "if an administrator terminates continuing benefits as a result of arbitrary and capricious conduct, the claimant should continue receiving benefits until the administrator properly applies the plan's provisions." *Pannebecker*, 542 F.3d at 1221 (citing *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1143, 1163 (9th Cir. 2001)). The Ninth Circuit reasoned that "[t]his distinction in remedies makes perfect sense, as the improper termination in the latter case was the result of arbitrary and capricious procedures, and therefore benefits could not have been terminated by those procedures." *Id.* (internal citation and quotation marks omitted).

*Pannebecker* further instructs that "whether the administrator abused its discretion because the decision was substantively arbitrary or capricious, or because it failed to comply with required procedures, benefits may still be reinstated if the claimant would have continued receiving benefits

1  absent the administrator's arbitrary and capricious conduct." *Id.* Under these principles, the court in

2  *Pannebecker* found that an award of back benefits was warranted because the beneficiary "was

3  already receiving benefits, and, but for [the administrator]'s arbitrary and capricious conduct—i.e.,

4  its failure to apply the terms of the Plan properly—she would have continued receiving them." 542

5  F.3d at 1221. Although the administrator was "given a second opportunity to determine whether

6  [the beneficiary] was 'disabled' under the Plan, that second chance should not have left [the

7  beneficiary] empty-handed during the time that it took [the administrator] to comply with the Plan's

8  requirements." *Id.* Accordingly, *Pannebecker* held that the beneficiary was entitled to back benefits

9  from the time of the administrator's first improper denial until the date that the administrator

10  properly applied the Plan's requirements. *Id.* at 1121-22.

11  Barnett likens this case to *Pannebecker* and has requested back benefits from the period of

12  October 1, 2009, to October 1, 2014, which is when he became ineligible for LTD benefits on

13  account of turning 65. Doc.85-1 at 1. He argues that he is entitled to benefits "solely by virtue of

14  the remand," as he was receiving continuing benefits when Sedgwick terminated his benefits. *Id.*

15  (emphasis in original).[12]

16  The Court agrees. Although *Pannebecker* is not exactly factually analogous, the Court finds

17  that its logic applies under the circumstances of this case, and that Barnett's scenario falls within

18  the scope of the second type of remedy identified in *Pannebecker*, which is applicable when "an

19  administrator terminates continuing benefits as a result of arbitrary and capricious conduct." *See*

20  542 F.3d at 1221. Other courts in this district have applied *Pannebecker* to order back benefits for

21  plaintiffs whose continuing benefits were terminated as the result of "arbitrary and capricious"

22  decisions by plan administrators. *See, e.g., Bertelson v. Hartford Life Ins. Co.*, 1 F. Supp. 3d 1060,

23  1075 (E. D. Cal. 2014) ("Here it is undisputed that Defendant terminated Plaintiff's long-term

24  disability benefits upon [an arbitrary and capricious] determination that she was no longer disabled.

25  Retroactive reinstatement of benefits is therefore the appropriate remedy."); *Kurth v. Hartford Life*

26

27  [12] Although Barnett's brief makes no mention of this issue, Barnett's declaration in support of his motion also requests an additional $19,540 to compensate him for money he lost because he took early retirement in November 2013, which he claims resulted from the Plan's termination of his LTD benefits. Doc. 85-4 ¶¶ 4-9. However, because this request was not formally made in Barnett's motion, and Barnett's declaration provides no legal authority for this request, the Court declines to consider it at this time.

28

*Ins. & Acc. Ins. Co.*, 845 F. Supp. 2d 1087, 1101-02 (C.D. Cal. 2012) ("But for Defendant's erroneous determination that Plaintiff was no longer entitled to benefits, Plaintiff would have continued receiving LTD benefits. Accordingly, reinstatement of the LTD benefits is appropriate."). Barnett's application for LTD benefits was approved by the Plan and became effective December 20, 2000, and he continued to receive LTD benefits until October 1, 2009. Although this Court ultimately affirmed that the termination of Barnett's LTD benefits had a reasonable basis, the Ninth Circuit's decision to remand this case effectively gave the Plan a "second opportunity" to supplement the original administrative record with evidence to support Sedgwick's original denial of Barnett's appeal and comply with its *own* requirement that the job Barnett could perform be in the same zone in which he last worked. As in *Pannebecker*, Barnett should not remain empty-handed during the time it took for Sedgwick to comply fully with the Plan's requirements, even though in both this case and *Pannebecker*, the decision to terminate benefits was upheld as reasonable. *See* 542 F.3d at 1221. This Court's second affirmance of the termination of Barnett's benefits does not change the fact that the Ninth Circuit explicitly deemed the original termination of his benefits, which did not properly address or support the Plan's determination on the zone issue, an abuse of discretion. *See* Doc. 77 at 2. Barnett is therefore entitled to "continue receiving benefits until [Sedgwick] properly applies the plan's provisions." *Pannebecker*, 524 F.3d at 1221.

For this reason, the Court rejects the Plan's argument that Barnett should not be awarded back benefits because "the Ninth Circuit's reversal was due to a purely ministerial omission, not due to arbitrary and capricious conduct by the Plan." *See* Doc. 86-1 at 14. The only case cited by the Plan in support of its position, *Langston v. N. Am. Asset Dev. Corp*, No. C 08-02560 SI, 2009 WL 941763, at *9 (N.D. Cal. Apr. 6, 2009), is easily distinguishable. In *Langston*, the court denied both parties' motions for summary judgment and remanded the case to the administrator for further investigation of the plaintiff's claim. *Id.* at *8. The court found that the administrator merely "failed to make adequate findings," but did not find that the administrator engaged in arbitrary and capricious conduct, as Sedgwick did this case. *Id.* Furthermore, the plaintiff in *Langston* was receiving benefits on a temporary basis and the administrator never made an original determination

that she was actually entitled to said benefits. *Id.* Therefore, she was not stripped of "continuing benefits," as Barnett was—the Plan explicitly found Barnett to be eligible for LTD benefits in 2001 and then terminated his benefits in 2009. But for Sedgwick's initial, unsupported determination, Barnett would have continued to receive LTD benefits until he reached the age of sixty-five or until there was a proper finding that he was no longer eligible for LTD benefits, whichever is sooner. Accordingly, as the ultimate determination on Barnett's eligibility for LTD benefits did not occur until the date of this Order, *Pannebecker* requires that the Court order reinstatement of back benefits from October 1, 2009 to October 14, 2014. *See* 542 F.3d at 1221.

Barnett's motion for the reinstatement of his back benefits is GRANTED and the Plan is ORDERED to pay Barnett back benefits from October 1, 2009 to October 1, 2014.[13]

### e. Prejudgment Interest

This Court "may award prejudgment interest on an award of ERISA benefits at its discretion." *Blankenship*, 486 F.3d at 627; *see also Shaw v. Int'l Ass'n of Machinists & Aerospace Workers Pension Plan*, 750 F.2d 1458, 1465 (9th Cir. 1985) (the decision to award prejudgment interest "is a question of fairness, lying within the court's sound discretion, to be awarded by balancing the equities."). "Prejudgment interest is an element of compensation, not a penalty," and the district court should select an interest rate that "compensates [the plaintiff] for the losses he incurred as a result of [the] nonpayment of benefits," rather than a rate that is punitive to the defendant. *Dishman v. UNUM Life Ins. Co. of Am.*, 269 F.3d 974, 988 (9th Cir. 2001). Moreover, "[a]lthough a defendant's bad faith may influence whether a court awards prejudgment interest rate, it should not influence the rate of interest." *Dishman*, 269 F.3d at 988. Ordinarily, "the interest rate prescribed for post-judgment interest under 28 U.S.C. § 1961[a] is appropriate for fixing the rate of pre-judgment interest unless the trial judge finds, on substantial evidence, that the equities of that particular case require a different rate." *Grosz-Salomon*, 237 F.3d at 1154. "Substantial evidence" is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Blankenship*, 486 F.3d at 628.

---

[13] Barnett requests back benefits in the amount of $147,782.00 for the time between October 1, 2009 and October 1, 2014 (Doc. 89 at 10) and has submitted a declaration indicating that his LTD benefits from Edison were $2,903.64 per month (Doc. 85-4 ¶ 2). However, Barnett's declaration also seems to indicate that he is unsure of the exact calculations (Doc. 85-4 ¶ 5) and the Court is not in a position to determine the exact amount of back benefits owed to Barnett at this time.

Barnett seeks prejudgment interest at a rate of 10 percent on the back benefits, amounting to $46,717.72, which he claims is "sufficient to compensate [him] for his loss of investment income and the delayed use of [his] LTD benefits" (Doc. 85-1 at 22), and "necessary to make [him] whole" (Doc. 89 at 7). He offers no evidence to justify a 10% interest rate. *See id.* The Plan argues that Barnett is not entitled to prejudgment interest because there was no bad faith on the part of the Plan in these proceedings. Doc. 88 at 21.

Here, the Court, in its discretion, determines that prejudgment interest is warranted. *Blankenship*, 486 F.3d at 627. The Court is not persuaded by the Plan's argument that under *Echague v. Metro. Life Ins. Co.*, 69 F. Supp. 3d 990, 999 (N.D. Cal. 2014), it would be inappropriate to award prejudgment interest, because the decision to do so is solely a matter of discretion, and the absence of bad faith does not necessitate that the Court decline to award prejudgment interest. *See Dishman*, 269 F.3d at 988; *Fleming v. Kemper Nat. Svcs. Inc.*, 373 F. Supp. 2d 1000, 1013 (N.D. Cal. 2005). Nevertheless, as Barnett has failed to set forth "substantial evidence" showing that the equities in this case require a different rate, the Court is unwilling to approve a 10 percent interest rate and sees no reason to depart from the default rate set forth in 28 U.S.C. § 1961(a).[14]  In cases where courts have deviated from the default rate, the plaintiffs generally provided specific documentation as to the time value of the withheld benefits, thereby satisfying the "substantial evidence" requirement.[15] In cases where the plaintiffs did not make such

---

[14] "Interest shall be allowed on any money judgment in a civil case recovered in a district court … Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding [] the date of the judgment."

[15] *See, e.g.*, *Blankenship*, 486 F.3d at 628 (10.01 percent prejudgment interest rate, compounded monthly, was appropriate where the plaintiff was forced to replace the money he would have earned from the ERISA plan with personal funds that would have otherwise invested in a mutual fund earning interest at 10.01%); *Barboza v. Cal. Ass'n of Professional Firefighters*, --- F. Supp. 3d ---, No. 2:08-cv-0519-KJM-EFB, 2015 WL 7273215, at *6 (E. D. Cal. 2015) (awarding a 5 percent prejudgment interest rate in light of the plaintiff's evidence that he had paid interest rates of 4.92 percent to 9.10 percent "on a home equity line of credit to cover his expenses while awaiting benefit payments"); *Harlick v. Blue Shield of Cal.*, No. C 08-3651-SC, 2013 WL 2422900, at *2 (N.D. Cal. June 3, 2013) (awarding a prejudgment interest rate that accounted for the interest payments made in connection with a home equity line and the two home re-financings that the plaintiffs undertook to pay for expenses that should have been covered by the ERISA plan); *accord Delaney v. Prudential Ins. Co of America*, 68 F. Supp. 3d 1214, 1232 (D. Or. 2014) ("general statements to the effect that the award of prejudgment interest at below market rates [do] not fully compensate a prevailing party" were insufficient to satisfy the "substantial evidence" requirement).

1  a showing, as is the case here, courts award the default rate.[16]

2      None of the cases cited by Barnett dictate that the Court must find otherwise. In *Lested v.*

3  *Alaris Med. Systems, Inc.*, No. 08-cv-1495 JM-WMC, 2010 WL 1416544, at *2 (S.D. Cal. Apr. 8,

4  2010), the court noted that the plaintiff had requested a prejudgment interest rate of 5 percent

5  because the rate prescribed by 28 U.S.C. § 1961(a) is "historically low," and found that the 5

6  percent rate was a "reasonable approximation of the time value of the money improperly withheld."

7  Similarly, in *White v. Coblentz, Patch & Bass LLP Long Term Disability Plan*, No. C 10-1855 BZ,

8  2010 U.S. Dist. LEXIS 90530, at *3 (N. D. Cal. Aug. 15, 2011), the court noted that "a

9  prejudgment interest award based on the current Treasury bill rates would be inappropriate"

10  because "[t]hese rates, which have been kept artificially low for the past few years by the Federal

11  Reserve for reasons having to do with the state of the economy, do not necessarily reflect the rate of

12  return plaintiff may have earned had she the use of her unpaid benefits or defendant likely earned

13  while retaining the use of this money." In *Jadwin v. County of Kern*, 767 F. Supp. 2d 1069, 1096

14  (E.D. Cal. 2011), the court found that the plaintiff was eligible for prejudgment interest at a rate

15  that was the average of the prime rate and the California statutory rate in a case that did not arise

16  under ERISA. Although these cases suggest that the default rate prescribed in 28 U.S.C. § 1961(a)

17  may be too low to serve as adequate compensation under certain circumstances, these cases fail to

18  provide a sufficient basis to diverge from the default rate in this case because they alone cannot

19  serve as "substantial evidence" that Barnett warrants a higher prejudgment interest rate, especially

20  as Barnett has failed to provide specific documentation as to the time value of the benefits that were

21  withheld.

22      To calculate prejudgment interest under 28 U.S.C. § 1961, the starting point is "the average

---

[16] *See, e.g., Day v. AT&T Disability Income Plan*, 608 F. App'x 454, 458-89 (9th Cir. Apr. 9, 2015) (affirming the district court's decision to apply the default interest rate because the plaintiff failed to provide substantial evidence justifying a higher rate); *F. v. Blue Shield of Cal.*, No. 09-cv02937-PJH, 2016 WL 1059459, at *5 (N.D. Cal. Mar. 15, 2016) (a "vague and unsubstantiated reference" that plaintiff was "denied the use of the funds for years" was insufficient to meet the "substantial evidence" standard for increasing the amount of prejudgment interest above the statutory default rate); *Bigham v. Liberty Life Assurance Co. of Boston*, ___ F. Supp. 3d ____, No. C15-349-RSM, 2015 WL 8489417, at *8 (W.D. Wash. Dec. 11, 2015) (permitting the plaintiff "to recover pre-judgment interest on [] unpaid benefits consistent with the rate prescribed for post-judgment interest under 28 U.S.C. § 1961(a)"); *Abdullah v. AccentCare Long Term Disability Plan*, No. C-09-02909 MMC, 2012 WL 4112291, at *12-13 (N.D. Cal. Sept. 19, 2012) (awarding the statutory rate because "no such evidence has been presented in support of [plaintiff's request for an award at 10 % rather than the rate prescribed by § 1961(a), nor does the record reflect an equitable reason for deviating from the calculation ordinarily used").

1   52-week Treasury bill rate operative immediately prior to the date of payment by the underwriters."

2   *Nelson v. EG&G Energy Measurement Grp., Inc.*, 37 F.3d 1384, 1391-92 (9th Cir. 1994).

3   Reasoning that "prejudgment interest is intended to cover the lost investment potential of funds to

4   which the plaintiff was entitled, from the time of entitlement to the date of judgment," the *Nelson*

5   court found that "[i]t is the treasury bill rate during this interim that is pertinent, not the Treasury

6   bill rate at the time of judgment." *Id. Nelson* affirmed the approach of the district court, which

7   calculated interest "as though the plaintiffs had invested the withheld funds at the 52-week Treasury

8   bill rate and then reinvested the proceeds annually at the new rate" as "reasonably reflect[ing] the

9   conservative investment income the plaintiffs would have been able to have earned had they

10   received the funds on [the date of entitlement]." *Id.*

11        Here, Barnett is entitled to prejudgment interest on the back benefits from October 1, 2009,

12   to October 1, 2014, which dictates the applicable interest rate pursuant to the method set forth in

13   *Nelson*.[17] Specifically, Barnett "is due interest equivalent to that which would have accrued if he

14   had invested his LTD benefits at a rate equal to the weekly average 1-year constant maturity

15   Treasury yield at the time of the reinvestment," until October 1, 2014. *Caplan v. CAN Fin. Corp.*,

16   573 F. Supp. 2d 1244, 1253 (N.D. Cal. 2008). Barnett's motion for prejudgment interest is

17   GRANTED IN PART AND DENIED IN PART. The Court declines to award Barnett the requested

18   10 percent rate, but will award Barnett prejudgment interest at the default rate in 28 U.S.C.

19   § 1961(a).

20                      **ATTORNEY'S FEES AND LITIGATION COSTS**

21   **I.     Standard of Review**

22        Under 29 U.S.C. § 1332(g)(1), "the court in its discretion may allow a reasonable attorney's

23   fee and costs of action to either party" in an ERISA suit. In *Hardt v. Reliance Standard Life Ins.*

24   *Co.*, the Supreme Court held that in order for a claimant to be entitled to fees under § 1332(g)(1),

25   the claimant must show "'some degree of success on the merits.'" 560 U.S. 242, 255 (2010)

26   (quoting *Ruckelhaus v. Sierra Club*, 463 U.S. 680, 688 (1983)). "A claimant does not satisfy that

27

28   ---
[17] Although Barnett has filed a calculation of prejudgment interest, Barnett's calculations presume an interest rate of 10%. Doc. 85-2, Ex. 19. Because the Court declined to award a 10 percent interest rate, the prejudgment interest must be re-calculated at the statutory rate set forth in 28 U.S.C. § 1961(a).

requirement by achieving 'trivial success on the merits' or a 'purely procedural victor[y],' 'but does satisfy it if the court can fairly call the outcome of the litigation some success on the merits without conducting a 'lengthy inquir[y]' into the question whether a particular party's success was 'substantial' or occurred on a 'central issue.'" *Id.* (quoting *Ruckelhaus*, 463 U.S. at 694)). Therefore, the first step in the Court's inquiry is to determine whether Barnett "has achieved some degree of success on the merits." *Simonia v. Glendale Nissan/Infiniti Disability Plan*, 608 F.3d 1118, 1122 (9th Cir. 2010).

If the Court finds "some degree of success on the merits," the Court then turns to the factors set forth in *Hummell v. S.E. Rykoff & Co.*, 634 F.2d 446, 453 (9th Cir. 1980). *Id.* These factors are as follows:

(1) the degree of the opposing party's culpability or bad faith;

(2) the ability of the opposing party to satisfy an award of fees;

(3) whether an award of fees against the opposing parties would deter others from acting under similar circumstances;

(4) whether the party requesting fees sought to benefit all participants and beneficiaries of ERISA; and

(5) the relative merits of the parties positions.

*Hummell*, 534 F.3d at 453. No one factor is "necessarily decisive" and "various permutations and combinations can support an award of attorney fees." *Paddack v. Morris*, 783 F.2d 844, 846 (9th Cir. 1986) (quoting *Carpenters S. Cal. Admin. Corp. v. Russell*, 726 F.2d 1410, 1416 (9th Cir. 1984)). In applying the *Hummell* factors, the Court "must keep at the forefront ERISA's remedial purposes that 'should be liberally construed in favor of protecting participants in employee benefits plans,'" and also "appl[ies] a 'special circumstances' rule in which a successful ERISA participant 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'" *McElwaine v. US West, Inc.*, 176 F.3d 1167, 1172 (9th Cir. 1999) (quoting *Smith v. CMTA-IAM Pension Trust*, 746 F.2d 587, 589 (9th Cir. 1984)).

The Court may only award attorney's fees if it determines that Barnett has achieved "some degree of success on the merits," as contemplated by *Hardt*, and if the *Hummell* factors weigh in

favor of awarding him fees. *Simonia*, 608 F.3d at 1122. If Barnett passes both the *Hardt* and

*Hummell* requirements, the Court will utilize a "two-step hybrid lodestar/multiplier approach" and

"multiply the number of hours reasonably expended on the litigation by a reasonable hourly rate."

*Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 945-46 (9th Cir. 2007); *Barnes v. AT&T Pension*

*Benefit Plan-Nonbargained Program*, 963 F. Supp. 2d 950, 961 (N.D. Cal. 2013).

## II.    Analysis

### a.    "Some Degree of Success on the Merits"

Barnett contends that he is entitled to attorney's fees "solely by virtue" of the Ninth

Circuit's remand. Doc. 85-1 at 5-6. He compares his case to *Hardt*, where the Supreme Court found

that because the plaintiff "persuaded the district court to find that the plan administrator failed to

comply with ERISA guidelines," and the district court ordered that the case be remanded to the

administrator, she nevertheless had achieved "some success on the merits," notwithstanding her

failure to win summary judgment on her benefits claim. *See* 560 U.S. at 255-56. Under *Hardt*,

Barnett argues that he is entitled to attorney's fees based on "the remand [from the Ninth Circuit]

alone." Doc. 85-1 at 19.

The Plan counters that there has been no degree of success on the merits, and that *Hardt* is

distinguishable, noting that the plaintiff in *Hardt* had convinced the district court that there was

"compelling evidence" that she was totally disabled, and that the district court stated that it was

"inclined to rule in [plaintiff]'s favor," but declined to grant her summary judgment before first

giving the defendant a chance to address deficiencies in its statutorily-mandated review of that

claim. Doc. 88 at 9 (quoting *Hardt*, 560 U.S. at 256). The Plan distinguishes *Hardt* from this case,

pointing out that Barnett has not actually obtained a remand to the Administrator, as the plaintiff in

*Hardt* had. *Id.* at 10-11. The Plan further argues that "[t]here is no degree of success on the merits

when the court has never made a determination that a plaintiff is eligible for benefits coverage,"

citing *King v. Aetna Life Ins. Co.*, No. 09-cv-0988 DSF (RCx), 2011 WL 2682102, at *5 (C.D. Cal.

July 7, 2011), where the court determined that the administrator "acted reasonably and did not act

arbitrarily or capriciously in denying the claims," and declined to award attorney's fees. Doc. 88 at

9. In *King*, the court justified its finding that "Plaintiffs did not achieve any degree of success

within the meaning of *Hardt*," reasoning that it "never made any determination that the [claimants] are eligible for coverage." 2011 WL 2682102 at *5.

The Court finds that although neither case is directly on point, Barnett's situation is more akin to *Hardt*, as opposed to *King*. Although this Order ultimately affirms Sedgwick's decision to terminate Barnett's benefits in light of an augmented administrative record following remand, the fact remains that Barnett succeeded on one of the theories he presented on appeal, as the Ninth Circuit held that Sedgwick's initial determination was an abuse of discretion and vacated this Court's earlier decision as a result. "[A] plaintiff has experienced 'some degree of success on the merits' when he presents a claim that the defendant violated his rights and the court rules that the defendant did violate those rights." *Olds v. Ret. Plan of Intern. Paper Co., Inc.*, No. 09-0192-WS-N, 2011 WL 2160264, at *2 (S.D. Ala. June 1, 2011) (citing and interpreting *Ruckelhaus*, 463 U.S. at 681-82). Moreover, in light of the Ninth Circuit's decision, this Court determined that Barnett is eligible for back benefits and prejudgment interest, which elevates his achievement beyond a mere "trivial success on the merits" or "purely procedural victory," and sufficiently distinguishes this case from *King. See Barnes*, 963 F. Supp. 2d at 961-62 (quoting *Taaffe v. Life Ins. Co.*, 769 F. Supp. 2d 530, 540-41 (S.D. N.Y. 2011) (a "purely procedural victory" would merely "'involve success on a procedural as opposed to a substantive issue. For example, winning a motion for class certification or a motion to intervene would constitute a purely procedural victory because such a success does not bring the victorious party any closer to its desired relief.'"). For these reasons, the Court concludes that Barnett has achieved "some degree of success on the merits," as contemplated by *Hardt*, 560 U.S. at 256.

### b. *Hummell* Factors

Having determined that Barnett has achieved "some degree of success on the merits," the Court now turns to the *Hummell* factors to guide its discretion. *Simonia*, 608 F.3d at 1119.

#### i.    Degree of Defendant's Culpability or Bad Faith

The Court reiterates its finding that there is no evidence of bad faith on the Plan's part, notwithstanding Barnett's multiple accusations that the denial of his benefits "was based on a fundamental lie" (Doc. 85-1 at 20), and various statements in the first declaration of Barnett's

counsel Robert Rosati ("Rosati") that the Plan has been deceptive throughout this litigation (Doc. 85-2 ¶¶ 13-14). As the Court noted above, the Plan's submission of extrinsic evidence and its Central zone theory following remand are not indicative that the Plan engaged in misrepresentation or deception, but rather, was the result of Barnett's delay in raising the zone issue. The Court agrees with the Plan's contention that it has maintained a consistent position throughout these proceedings that its termination of Barnett's benefits and denial of his appeal was proper and has "merely present[ed] arguments as to how the existing evidence might be interpreted." Doc. 88 at 6.

Nevertheless, "bad faith is not required for an award of attorneys' fees." *Caplan*, 573 F. Supp. 2d at 1248. An ERISA defendant may be deemed "culpable" under *Hummell* if it "owed the plaintiff a legal duty that it did not fulfill." *Id.* As the Ninth Circuit determined that the initial decision on Barnett's eligibility for benefits was an abuse of discretion, the Court finds that the Plan is "culpable," as described in *Caplan*, and that this factor therefore favors an award of fees. *See id.*; *accord Schofield v. Metropolitan Life Ins. Co.*, No. 06-cv-0017-GEB-GGH, 2009 WL 1035224 at *1 (E.D. Cal. Apr. 17, 2009) (finding the first factor to weigh in favor of attorney's fees when the Ninth Circuit found that the defendant had abused its discretion in erroneously applying the terms of the plan to the plaintiff's claim and remanded the case).

### ii.    Ability of Defendant to Satisfy a Fee Award

Because the Plan admits that it has the ability to satisfy a fee award (Doc. 88 at 14), this factor favors an award of fees. *Barnes*, 963 F. Supp. 2d at 967.

### iii.    Deterrent Effect of Fee Award

"This factor evaluates whether an award of fees against [the Plan] would deter others from acting under similar circumstances." *Id.* Although the Plan concedes that the Ninth Circuit's decision "certainly may encourage the Plan to include more details regarding the location of reasonable jobs in its Administrative records," it argues that a fee award would not necessarily deter others from acting under similar circumstances because there was ultimately evidence to support its termination of Barnett's benefits and denial of his appeal. Doc. 88 at 13. Barnett makes no meaningful argument to the contrary. *See* Doc. 85-1 at 10. The Court therefore finds that this factor weighs against an award of fees. *See Koloff v. Metropolitan Life Ins. Co.*, No. 13-cv-02060 LJO

JLT, 2014 WL 3420990, at *10-11 (E.D. Cal. July 14, 2014).

iv.     **Benefit for All Plan Participants or Resolution of Significant Legal Question Regarding ERISA**

As Barnett concedes that he has made "no argument that requesting fees in this case would benefit all participants and beneficiaries in the ERISA plan or that this case resolved a significant legal question regarding ERISA" (Doc. 85-1 at 10), this factor weighs against an award of fees. *Oster v. Barco of Cal. Emps.' Ret. Plan*, 869 F.2d 1215, 1222 (9th Cir. 1988).

v.     **Relative Merits of the Parties' Positions**

The Court notes that there is some merit to both of the parties' positions—the Plan ultimately prevailed with regard to the zone issue, but only after Barnett raised the issue on appeal and achieved a remand from the Ninth Circuit. Although the Plan argues that most of the legal theories Barnett raised were rejected by both this Court and the Ninth Circuit (Doc. 88 at 14), because Barnett persuaded the Ninth Circuit to vacate and remand the Court's earlier judgment and this Court decided to award him back benefits and prejudgment interest, the Court found that Barnett had achieved "some degree of success within the merits." *See Hardt*, 560 U.S. at 256. Because the analysis for this factor mirrors the *Hardt* analysis, the Court likewise finds that this factor favors an award of fees. *See Barnes*, 963 F. Supp. 2d at 968.

vi.     **Summary**

Two factors weigh against and three factors support an award of attorney's fees. The Court finds that the *Hummell* factors, considered in light of ERISA's remedial purpose, therefore support an award of attorney's fees in this case. *McElwaine*, 176 F.3d at 1172.

c.   **Reasonableness of Requested Attorney's Fees**

The Court will employ the "hybrid lodestar/multiplier approach" as the proper method for determining the amount of attorney's fees in this case. *Van Gerwen v. Guarantee Mut. Life Co.*, 214 F.3d 1041, 1045 (9th Cir. 2000). Under this method, the Court first "determines the 'lodestar' amount by multiplying the number of hours reasonably expended by a reasonable hourly rate." *Id.* (citing *D'Emanuele v. Montgomery Ward & Co.*, 904 F.2d 1379, 1384 (9th Cir 1990)). "The party seeking an award should submit evidence supporting the hours worked and the rates claimed."

1  *Hensley v. Eckerhart*, 461 U.S. at 424, 433 (1983). Second, the Court "may adjust the lodestar

2  upward or downward using a 'multiplier' based on factors[18] not subsumed in the initial

3  calculation of the lodestar." *Van Gerwen*, 214 F.3d at 1045. However, the lodestar amount is

4  "presumptively the reasonable amount," and the multiplier is used only in "'rare' and 'exceptional'

5  cases, supported by both 'specific evidence' on the record and detailed findings.'" *Van Gerwen*,

6  214 F.3d at 1045.

7      Here, Barnett seeks attorney's fees for Rosati in the amount of $214,860—for 358.10 hours

8  of work at a $600 hourly rate, and reimbursement of $2,594.15 for costs and expenses. Doc. 89 at

9  10. Furthermore, Barnett argues that a fee enhancement is merited on account of the Plan's

10  "unreasonable delay" and alleged deception, and requests that the Court impose double fees, an

11  additional $214,860. *Id.*

12              **i.  Hourly Rate**

13      In determining a "reasonable hourly rate," the Court considers "the experience, skill, and

14  reputation of the attorney requesting fees." *Welch*, 480 F.3d at 946 (quoting *Chalmers v. City of Los

15  Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986)). The reasonable hourly rate "should be established

16  by reference to the fees that private attorneys of an ability and reputation comparable to that of

17  prevailing counsel charge their paying clients for legal work of similar complexity." *Id.* (quoting

18  *Davis v. City and Cty. Of San Francisco*, 976 F.2d 1536, 1545 (9th Cir. 1992)). Barnett bears the

19  burden of proving that the requested rate is "in line with the 'prevailing market of the relevant

20  community.'" *Carson v. Billings Police Dept.*, 470 F.3d 889, 891 (9th Cir. 2006); *see also Blum v.*

21  *Stenson*, 465 U.S. 886, 895 n.11 (1984). The "relevant community" for purposes of the "prevailing

22  market rate" is the "forum in which the district court sits." *Camacho v. Bridgeport Fin., Inc.*, 523

23  ---

[18] These factors are as follows:

    (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Gonzalez*, 729 F.3d at 1209 n. 11 (quoting *Morales v. City of San Rafael*, 96 F.3d 359, 363 n. 8 (9th Cir. 1996)). "However, if the district court has 'taken [any of these factors' into account in either the reasonable hours component or the reasonable rate component of the lodestar calculation,' then it should not again reduce the lodestar." *Id.* (Quoting *Kerr v. Screen Guild Extras, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975)).

F.3d 973, 979 (9th Cir. 2008). Thus, when a case is filed in the Fresno Division of the Eastern District of California, "[t]he Eastern District of California, Fresno Division," is the appropriate forum to establish the lodestar hourly rate." *Jadwin*, 767 F. Supp. 2d at 1129. "Affidavits of the plaintiffs' attorney and other attorneys regarding the prevailing fees in the community, and rate determinations in other cases, particularly those setting a rate for the plaintiffs' attorney, are satisfactory evidence of the prevailing market rate." *Welch*, 480 F.3d at 947 (quoting *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990)).

In support of his requested rate of $600 per hour (Doc. 85-1 at 18), Barnett has submitted declarations from his attorney Rosati (Doc. 85-2) and two other ERISA attorneys, Glenn Kantor ("Kantor") (Doc. 85-5) and Joseph Creitz ("Creitz") (Doc. 85-6). Both Kantor and Creitz opine that Rosati's rate is reasonable in light of rates charged by other ERISA plaintiff-side attorneys, and is consistent with Rosati's reputation in the ERISA bar and level of experience. *See id.* However, because neither Kantor nor Creitz indicated that they have litigated ERISA cases in the Fresno Division, the Court finds their affidavits to be of limited usefulness in determining a reasonable hourly rate for Rosati for this case, as the Court must ensure that the requested rate is in line with the prevailing rate in Fresno. *Carson*, 480 F.3d at 891. Rosati's declaration indicates that his firm has requested a $600 rate in four out-of-district cases from 2013 and 2014. Doc. 86-2 ¶ 25. However, these exemplar cases are also of limited usefulness because they did not arise in the Fresno Division and thus cannot serve to meet Barnett's burden of demonstrating that the rate is consistent with the community standard in Fresno. *See Blum*, 465 U.S. at 895 n. 11.

The most recent case from the Fresno Division that awarded attorney's fees in an ERISA case is *Bd. of Trs. of IBEW Local Union No. 100 Pension Tr. Fund v. Porges*, No. 11-cv-02048-LJO-SKO, 2013 WL 6596943 (E.D. Cal. Dec. 16, 2013). In *Porges*, a court approved a rate of $285 for an attorney with 39 years of experience, whose regular hourly rate is $340. *Id.* at *7. The Court has also consulted more recent cases that discussed attorney's fees in the Fresno Division, although these cases did not concern ERISA. *See, e.g.*, *Nadarajah v. Holder*, 569 F.3d 906, 917 (9th Cir. 2009) (finding that courts may rely on decisions by other courts awarding similar rates for work in the same geographical area by attorneys with comparable levels of experience). Based upon the

32

Court's review of these cases, the appropriate range for attorney's fees in the Fresno Division is $250 to $400 per hour.[19]

Thus, as the upper limit in the Fresno Division ranges from $380 to $400 per hour, the Court declines to award Rosati the requested $600 rate. However, in light of Rosati's experience and relevant expertise—as a seasoned litigator with approximately 32 years of experience in handling ERISA cases who currently bills a $630 hourly rate (Doc. 85-2 ¶¶ 19-21), and the Plan's failure to file anything with regard to the requested fee, the Court finds it appropriate to award Rosati a rate of $380 per hour for the lodestar calculation.

### ii.  Hours Reasonably Expended

Next, the Court turns to the number of hours reasonably expended. *Hensley*, 461 U.S. at 434. The burden is on Barnett "to produce sufficient evidence to support the claim for the fee award … and [he] need only provide a minimal level of detail that identifies the general subject matter of the time expenditures." *Archer v. Gipson*, No. 12-cv-00261-LJO-JLT, 2015 WL 9473409, at *7 (E.D. Cal. Dec. 28, 2015). The Court begins its analysis with the billing records submitted by Barnett, and determines whether such hours are "reasonable." *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013); *see also Jordan v. Multnomah Cty.*, 815 F.2d 1258, 1263 n.8 (9th Cir. 1987) ("the district court should not uncritically accept counsel's representations concerning the time expended"). The Court has wide discretion to determine the reasonableness of the hours claimed and reduce these if not reasonably expended, *see Sorenson v. Mink*, 239 F.3d 1140, 1146 (9th Cir. 2001), but must provide a "clear and concise explanation" for any specific cuts it finds suitable to apply. *Gonzalez*, 729 F.3d at 1205 (citing *Gates v. Deukmejian*, 987 F.2d 1392, 1400 (9th Cir. 1992)).

In determining the appropriate lodestar amount, the Court "may exclude from the fee

---

[19] *See, e.g.*, *Gonzalez-Chavez v. City of Bakersfield*, No. 12-cv-2053 JLT, 2016 WL 2898132 at *6-7 (E.D. Cal. May 17, 2016) (reducing the $520 rate requested to $380 for an attorney with over 20 years of experience, because the requested rate exceeded the range generally awarded in the Fresno Division); *Richardson v. THD At-Home Svcs., Inc.*, No. 14-cv-0273 BAM, 2016 WL 1366952 at *10-11 (E.D. Cal. Apr. 6 2016) ("rates for the Fresno Division have been identified between $250 and $380, with the highest rates reserved for attorneys with more than 20 years of experience."); *Callahan v. City of Sanger*, No. 14-cv-00600 BAM, 2016 WL 1073249 at *5 (E.D. Cal. Mar. 18, 2016) (finding that "current reasonable rates for the Fresno Division, depending on the attorneys' experience and expertise, have been identified between $250 and $400 per hour," and deeming reasonable a $325 rate to be for an attorney with eleven years of experience and expertise in the relevant law).

request any hours that are 'excessive, redundant, or otherwise unnecessary.'" *Welch*, 480 F.3d at 946 (quoting *Hensley*, 461 U.S. at 434). In order to exclude hours that are "excessive, redundant, or otherwise unnecessary," the Court may use one of two methods: 1) conduct an "hour-by-hour analysis of the fee request," and exclude hours that were not reasonably necessary; and 2) if faced with a "massive fee application," the court has the authority to make an "across-the board percentage cut[]" in either the number of hours claimed or in the final lodestar figure." *Gonzalez*, 729 F.3d at 1203 (quoting *Gates*, 987 F.2d at 1399). Should the Court determine that a percentage cut is warranted, it must "set forth a concise but clear explanation of its reasons for choosing a given percentage reduction." *Id.*

Barnett requests fees for 358.10[20] hours of work (Doc. 89 at 10) and has provided timesheets detailing the work for which Rosati seeks compensation (Doc. 85-2, Ex. 16; Doc. 89-1, Ex. 30). For each task completed, Rosati includes the date, a brief description, and the number of hours. *See id.* The hours are summarized as follows:

| | |
|---|---|
| Preliminary work on the Complaint | 9.70 |
| Preliminary issues, discovery, and discovery-related matters | 53.70 |
| Cross-motions for summary judgment (in 2013) | 81.40 |
| Settlement negotiations | 27.80 |
| Trial briefing | 42.60 |
| Ninth Circuit proceedings | 83.80 |
| Post-remand matters (before 3/21/2016) | 38.80 |
| Post-remand matters (after 3/21/2016) | 20.30 |
| Total | 358.10 |

Doc. 85-1 at 18; Doc. 89-1, Ex. 30. In his declaration, Rosati attests that the timesheet "is a true and correct summary of the time and services [he] performed in this case for the fees sought," that hours

---

[20] Initially, Barnett requested 341.70 hours (Doc. 85-1 at 22), but later conceded that 3.9 hours should be deducted, and requested an additional 20.3 hours for Rosati's work on the opposition to the Plan's motion and preparing the reply and supplemental declarations, which brings the total to 358.10 hours (Doc. 89-1 at 10).

for a related privacy case involving Barnett were excluded, and that he has only claimed hours for

work that had to be done by him personally and none of his staff could properly complete. Doc. 85-

2 ¶¶ 28-30.

Partial Success

The two-part test from *Hensley* that courts apply when a plaintiff succeeds on some, but not

all of his claims, has been adopted into the ERISA context. *See, e.g. Echague*, 69 F. Supp. 3d at

998; *Barnes*, 963 F. Supp. 2d at 968-69; *Stonebrae , L.P. v. Toll Bros., Inc.*, No. C-08-0221 EMC,

2011 WL 1334444, at *9-10 (N.D. Cal. Apr. 7, 2011). Under this test, the district court must

address two questions: "First, did the plaintiff fail to prevail on claims that were unrelated to the

claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the

hours reasonably expended a satisfactory basis for making a fee award?" *Hensley*, 461 U.S. at 434.

Under the first prong of *Hensley*, if the plaintiff's claims are not related, the plaintiff may

not receive attorney's fees for time spent on unsuccessful claims because such work "cannot be

deemed to have been expended in pursuit of the ultimate result achieved." *Id.* (internal citation

omitted). In *Hensley*, the Supreme Court noted that such unrelated claims, which do *not* involve a

"common core of facts" can be "treated as if they had been raised in separate lawsuits," which

therefore would permit a court to parse and separate unsuccessful claims from successful claims for

purposes of determining attorney's fees. *See id.* at 435. The hours spent on the unsuccessful,

unrelated claims are then deducted from the total. *See id.*

The Ninth Circuit has provided some additional guidance for determining whether claims

are related or unrelated, as contemplated by *Hensley*. *See, e.g.*, *Schwarz v. Sec'y of Health &

Human Svcs.*, 73 F.3d 895, 902-03 (9th Cir. 1995). In *Schwarz*, the Ninth Circuit noted that its

cases interpreting *Hensley* have concluded that the test for relatedness of claims "is whether relief

sought on the unsuccessful claim 'is intended to remedy a course of conduct entirely distinct and

separate from the course of conduct that gave rise to the injury on which the relief granted is

premised.'" *Id.* at 903 (quoting *Thorne v. City of El Segundo*, 802 F.2d 1131, 1141 (9th Cir.1986)).

Additionally, courts should consider whether the work on unsuccessful claims "also aided the work

done on the merits of the [successful claim]." *Id.* (citing *Herrington v. Cty of Sonoma*, 883 F.2d

739, 747 (9th Cir. 1989); *see also Cabrales v. Cty. Of Los Angeles*, 935 F.2d 1050, 1052 (9th Cir. 1991) ("we read *Hensley* as establishing a general rule that plaintiffs are to be compensated for attorney's fees incurred for services that contribute to the ultimate victory in the lawsuit. Thus, even if a specific claim fails, the time spent on that claim may be compensable, in full or in part, if it contributes to the success of the other claims.").

However, if different claims for relief *do* "involve a common core of facts" or are based on "related legal theories," the court turns to the second prong of *Hensley* and determines a fee award commensurate with the overall level of success. 461 U.S. at 435. In this inquiry, the court must "focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation," because "[s]uch a lawsuit cannot be viewed as a series of discrete claims" and it would be "difficult to divide the hours expended on a claim-by-claim basis." *Id.* at 435. Thus, because "the extent of a plaintiff's success is a crucial factor for determining the proper amount of an award of attorney's fees," if a plaintiff "achieved only limited success, the district could should award only the amount of fees that is reasonable in relation to the results obtained." *Id.* at 439-40; *see also Webb v. Sloan*, 330 F.3d 1158, 1169 (9th Cir. 2003) (finding a discretionary reduction appropriate when the plaintiff prevailed against only one of several defendants); *Thorne*, 802 F.2d at 1141 (quoting *Hensley*, 461 U.S. at 435) ("If the plaintiff obtained 'excellent results,' full compensation may be appropriate, but if only 'partial or limited success' was obtained, full compensation may be excessive.").

To determine the application of *Hensley* in this case, the Court first turns to *Hensley* itself, which originated through a complaint brought on behalf of all persons involuntarily confined at a state hospital. 461 U.S. at 426. After a three-week trial, the district court held that an involuntarily committed patient has a constitutional right to minimally adequate treatment, and found constitutional violations in five of six general areas, but found that in respect to the sixth general area, the defendant's provisions were minimally adequate. *Id*. at 427. When the plaintiffs filed for attorney's fees, seeking compensation for four attorneys who claimed 2,985 hours of work, the defendants opposed the request, arguing, *inter alia*, that the hours spent in pursuit of unsuccessful claims could not be included in the fee calculation. *Id*. In its ruling, the district court found that the

plaintiffs were the prevailing parties, despite not having succeeded on every claim, and "refused to eliminate from the award hours spent on unsuccessful claims." *Id.* at 428. Reasoning that under the defendants' proposed "mathematical approach" that compared the total number of issues in the case with those actually prevailed upon, "no consideration is given for the relative importance of various issues, the interrelation of the issues, the difficulty in identifying issues, or the extent to which a party may prevail on various issues." *Id.* The district court then concluded that the plaintiffs had "obtained relief of significant import," and awarded fees that largely complied with the amount requested. *Id.*

In reviewing the district court's ruling, the Supreme Court noted that the district court's award of fees "*may* have been reasonable" in light of the district court's finding that the plaintiffs had obtained "substantial relief." *Id.* at 437 (emphasis added). However, hypothetically, if the plaintiffs had succeeded on only one of their six general claims (as opposed to succeeding on all but one claim), "a fee award based on the claimed hours clearly would have been excessive." *Id.* at 437. But, "[g]iven the interrelated nature of the facts and legal theories in this case, the [d]istrict [c]ourt did not err in refusing to apportion the fee award mechanically on the basis of respondents' success or failure on particular issues." *Id.* at 438. The Supreme Court nonetheless found the district court's decision to be deficient because the district court failed to "answer the question of what is 'reasonable'" in light of the level of success, and "did not properly consider the relationship between the extent of success and the amount of the fee award." *Id.* Importantly, while noting that "[t]here is no precise rule or formula for making these determinations," the Supreme Court held that "[t]he district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for limited success. The court necessarily has discretion in making this equitable judgment." *Id.* at 436-47.

ERISA cases adopting the *Hensley* framework have therefore emphasized "the relationship between the extent of success and the amount of the fee award" in justifying the amount of attorney's fees to award. For instance, in *Echague*, the court was tasked with evaluating the plaintiff's motion for attorney's fees subsequent to its earlier order that granted the plaintiff's motion for summary judgment against one defendant, denied the plaintiff's motion for summary

judgment against another defendant, and granted the third defendant's motion for summary judgment. 69 F. Supp. 3d at 994. In evaluating the case under the first prong of *Hensley*, the court found all of the plaintiff's claims, which included two unsuccessful claims, to be "adequately related in that they involved a common core of facts and were based on related, although distinct, legal theories," and did not deduct any hours spent on the unsuccessful claims. *Id.* at 997. The court was persuaded by the plaintiff's argument that although he was ultimately unsuccessful on two claims, the discovery secured from all three defendants and the arguments raised under two different statutory provisions "were so intertwined" to his ultimately successful claim, that the time spent on the unsuccessful claims "cannot and should be separated out," in light the structure of the contract between the defendants and the fact that all the plaintiff's claims all centered on his allegation that one of the defendants improperly interpreted the plan, did not properly apply the plan's terms, and did not adequately communicate said terms. *Id.* Turning to the second prong of *Hensley*, the court found that because the plaintiff "achieved exactly what he sought in his complaint (payment of the value of the policies)," he had achieved "full success." *Id.* Noting that although the hours sought by counsel—700 hours of attorney time and 125 hours of paralegal time—were "high," the court observed that the case "was hard fought, involved multiple rounds of substantive briefings … and more than normal case management." *Id.* Therefore, the court awarded 90 percent of the fees sought by counsel after applying a discretionary 10 percent reduction "to account for excessive time spent on some of the more straightforward motions." *Id.*

Similarly, in *Barnes*, the court evaluated the plaintiff's motion for attorney's fees and non-taxable costs following its decisions to grant summary judgment in favor of the plaintiff on one count and grant summary judgment to the defendant on two counts, and the parties' stipulation to dismiss the two remaining counts. 963 F. Supp. 3d at 955. In *Barnes*, there was no issue with regard to the first prong of *Hensley*, but the analysis of the second prong was more complicated. *Id.* at 969. The court first found that "there should be a reduction of fees because of the limited success," as "[t]here is no dispute that Mr. Barnes achieved only limited success, because although he prevailed on Count I and part of Count II …, he did not prevail on Counts III through V and part of Count II," and the hours spent on the entirely of the litigation were therefore not "reasonably necessary to

38

obtain the relief that was ultimately obtained." *Id.* (citing *Velez v. Wynne*, 220 F. App'x 512, 513 (9th Cir. Jan. 29, 2007)). Next, the court took "into account the time frame for which fees may be recovered," and found that as a result of the ERISA notice violation asserted in Count I being "essentially remedied" as of a certain date, that the plaintiff could therefore not credibly claim fees incurred after that date. *Id.* Because the billing records were unclear, the court then ordered supplemental briefing on whether the requested fees were "reasonably necessary to obtain the relief that was ultimately obtained by Mr. Barnes," in light of the counts upon which he had prevailed, and whether a reduction should be made in light of the nature of the claims upon which the plaintiff had obtained some success. *Id.* at 970. Finally, the court pointed out that proportionality between the damages sought and damages obtained is an additional consideration. *Id.* (citing *McCown v. City of Fontana*, 565 F.3d 1097, 1103-04 (9th Cir. 2008), in which the Ninth Circuit concluded that the district court should have accounted for the fact that eight of the plaintiff's nine claims were dismissed at summary judgment in its calculation of attorney's fees).

Here, the parties first dispute whether this case involves a "common core of facts"— i.e., whether Barnett's zone claim can be separated from his unsuccessful claims for purposes of calculating attorney's fees. Barnett's position is that his claims involve a "common core of facts," Doc. 85-1 at 19. He argues that he has "completely prevailed in this case," presumes that he will receive all the relief "he could possibly have obtained," *id.* at 20, and notes that although "many of [his] legal theories were unconvincing, '[t]he result is what matters.'" Doc. 89-1 at 13 (quoting *Hensley*, 461 U.S. at 435).[21]

The Plan argues that Barnett has only achieved "extremely limited partial success," and that Barnett's claimed hours are unreasonable given that most of the hours pertain to legal theories on which Barnett lost, and that the fees requested are therefore not merited. Doc. 88 at 14-15, 17. The Plan notes that in the first stage of these proceedings, the Court agreed with the Plan that the relevant standard of review governing this case is abuse of discretion, and that the Court dismissed

---

[21] Under the Court's interpretation of *Hensley*, this portion of the decision is reserved for the times "[w]here a plaintiff has obtained excellent results," and not when the plaintiff "has achieved only partial or limited success," as is the case here. *See* 461 U.S. at 435-36. When the plaintiff obtains "excellent results," district courts should not reduce a fee award "simply because the plaintiff failed to prevail on every contention raised in the lawsuit … Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters." *Id.*

all of Barnett's substantive claims either on summary judgment or in its findings of facts and conclusions of law. *Id.* at 16. On appeal, Barnett then raised several challenges, almost all of which the Ninth Circuit rejected. *Id.* at 17. In consideration of the entire scope of this litigation, the Plan argues that it has been more successful than Barnett, at both the district and appellate levels, as both this Court and the Ninth Circuit have agreed with the Plan on almost every issue except for the zone issue. *Id.* Thus, the Plan seeks deduction of 133.6 hours from the claimed total, as these 133.6 hours pertain to work unrelated to the zone issue. *Id.* at 17-18. Furthermore, in addition to the 133.6-hour reduction, the Plan submits that the rest of the hours should be reduced by at least 50 percent to account for Barnett's overall level of success "on the entire litigation." *Id.* at 18-19.

Turning to the first step of the *Hensley* analysis, the Court agrees with Barnett that his claims involved a "common core of facts." All of the claims in Barnett's original complaint stem from the same underlying facts—namely, that Barnett was an employee of Edison working at SONGS until he became disabled, that he complied with the Plan's procedures for applying for LTD benefits, and then began receiving LTD benefits, the Plan terminated his LTD benefits in 2009, and denied his appeal in 2010. *See generally* Doc. 1. The claims all raise various allegations of ERISA violations against only the Plan. *See id.* Unlike the hypothetical posed by *Hensley*, these claims could not be "treated as if they had been raised in separate lawsuits." *See* 461 U.S. at 435. Rather, the claims are similar to the ones set forth in *Echague*, because although most of the claims were unsuccessful, the zone claim was "adequately related" to the other claims, as "the factual and legal focus" of all of Barnett's claims was that the Plan "improperly interpreted the Plan terms, did not properly apply the Plan terms, and did not adequately communicate the Plan terms to [Barnett]." *See* 69 F. Supp. 3d at 997-98. The Plan's termination of Barnett's LTD benefits and denial of his appeal form the only "course of conduct" for which Barnett sought relief through this lawsuit, and thus, under the Ninth Circuit's standard, all of Barnett's claims are sufficiently related under the first prong of *Hensley. See Schwarz*, 73 F.3d at 903. For this reason, the Court declines to impose the blanket 133.6-hour deduction of hours not related to the zone issue requested by the Plan, as this categorical exclusion approach has been eschewed by *Hensley* for interrelated claims. *See* 461 U.S. at 428; *see also Ryan v. Editions Ltd. West, Inc.*, 786 F.3d 754, 764-65 (9th Cir. 2015)

(finding that the district court erred in categorically eliminating fees on unsuccessful claims that were related to a successful claim). No hours will be deducted pursuant to the first step of *Hensley*. 461 U.S. at 435.

Next, the Court proceeds to the second step of *Hensley*—the level of Barnett's success, which requires the Court to review the entire scope of this litigation. Barnett initially pursued three claims for relief in his first complaint. Doc. 1. At the first stage of cross-motions for summary judgment, the Court found in favor of Barnett on his first cause of action, and issued mixed rulings on the remaining causes of action. Doc. 34 at 19. The Court subsequently dismissed the third cause of action as essentially asserting the same claims as the second cause of action. Doc. 40. Subsequent to the parties' agreement to forego trial and submit the matter on the papers, the Court entered judgment in favor of the Plan. Docs. 55, 56. On appeal, the Ninth Circuit rejected all but one of the several theories Barnett raised for recovery, but vacated and remanded this Court's earlier judgment for "further consideration" of the one issue upon which Barnett prevailed. Docs. 77, 82. On remand, this Court upheld the Plan's original termination of Barnett's LTD benefits after considering an augmented administrative record, but found Barnett to be eligible for back benefits, prejudgment interest, and attorney's fees.

The trajectory of this litigation makes it clear that Barnett has not "completely prevailed" in this case, and his statement that he "will receive all the relief he could possibly have obtained" was undoubtedly premature. Nevertheless, Barnett's success is not "extremely limited" as the Plan characterizes it, and the Plan's statement that Barnett "has not achieved *any* of the payments or damages claimed in his Complaint" was likewise premature. As in *Echague*, this case has been "hard fought," and both parties have prevailed on at least some of the many arguments that have been made throughout these proceedings. *See* 69 F. Supp. 3d at 998. Ultimately, Barnett did achieve some success on the merits of his legal claims by persuading the Ninth Circuit to vacate and remand the first judgment in this case, and persuading this Court to award him attorney's fees, and, most critically, all the back benefits he requested, along with prejudgment interest. Thus, the Court's task is to determine a fee award commensurate with these achievements. *Hensley*, 461 U.S. at 440.

41

"At the heart of this inquiry is whether [Barnett]'s accomplishments in this case justify the fee amount requested." *Thomas v. City of Tacoma*, 410 F.3d 644, 650 (9th Cir. 2005) (quoting *Thorne*, 802 F.2d at 1142). In doing so, however, the Court "need not, and indeed should not, become [a] green eye-shade accountant[]," as the "essential goal in shifting fees … is to do rough justice, not to achieve auditing perfection," and the Court may thus "take into account [its] overall sense of a suit." *Fox v. Vice*, 563 U.S. 826, 838 (2011). The Court has broad discretion[22] in making this equitable judgment, so long as it provides "a clear and concise explanation for why it chose the specific percentage to apply." *See Gonzalez*, 729 F.3d at 1200.

As to the appropriate fee award, the Court agrees with the Plan's argument that the Court must reduce Barnett's claimed hours, despite the zone theory being interrelated with the other theories, in light of the finding in *Hensley* that if the plaintiffs had "prevailed on only one of their six general claims … a fee award based on the claimed hours clearly would have been excessive." 461 U.S. at 436; *Ryan*, 786 F.3d at 765 ("the district court has discretion to select an adequate method for reducing [plaintiff]'s requested fees that balances [plaintiff]'s entitlement to fees as the prevailing party with her limited success in the litigation as a whole."). Upon its careful review of the entire scope of these proceedings, the Court finds that a 60 percent reduction in light of Barnett's "limited success" is justified. In this regard, the Court notes the unique posture and outcome of Barnett's proceedings, which do not fit neatly into the framework established above. While there are several factors that warrant a substantial reduction in the hours Barnett has requested, Barnett's success on his claims for back benefits, prejudgment interest, and attorney's fees serves as a significant counterweight. When considered collectively, all of the factors in this case justify a 60 percent reduction in the number of hours requested.

The factors supporting a downward reduction are as follows. First, Barnett lost on the main

---

[22] *See, e.g., Hall v. City of Fairfield*, No. 2-10-cv-0508 DAD, 2014 WL 1286001, at *19 (E.D. Cal. Mar. 31, 2014) (applying a 40 percent downward adjustment where plaintiffs' complaint alleged six causes of action against multiple defendants, but they only achieved a verdict in their favor on one claim against one of the defendants); *Jones v. City of Sacramento*, No. CIV S-09-1025 DAD, 2011 WL 3584332 at *19 (E.D. Cal. Aug. 12, 2011) (applying a 25 percent downward adjustment where the plaintiff prevailed against all five defendants on one of his two claims, obtained a jury verdict that the conduct of each defendant was malicious, oppressive, or in reckless disregard of his right, but was awarded only $31,000 in damages after requesting $1,470,539.81); *Jones v. McGill*, No. 1:08-CV-00396-LJO-DLB, 2009 WL 1862457, at *5 (E.D. Cal. June 29, 2009) (reducing attorney's fees from the original lodestar calculation of $83,360 to $20,000 where the jury found in favor of the plaintiff on one claim against one of eight named defendants and awarded the plaintiff $9,900 in damages after the plaintiff had requested $15,200,000).

claim for which he sought relief through this lawsuit: the termination of his LTD benefits and the denial of his appeal. Legally speaking, the Plan had a reasonable basis for terminating Barnett's LTD benefits and did not abuse its discretion when it did so in light of an augmented administrative record—which was the central legal issue in this case. The fact that Barnett lost on the central legal issue in this case is, in itself, a reason for the Court to exercise a discretionary reduction in the hours requested. *See Barnes*, 963 F. Supp. 2d at 969. Second, while Barnett did achieve some degree of success on three legal issues—back benefits, prejudgment interest, and attorney's fees— the Court finds that his success on these claims is also limited, for two main reasons. First, the Court declined to award prejudgment interest and attorney's fees at the rates Barnett requested, as he failed to provide adequate legal justification for these rates. Second, the only reason this case advanced the way it did on appeal was because Barnett raised a new legal argument in a reply brief, and this new legal argument formed the basis for the Ninth Circuit's decision vacating and remanding this Court's earlier decision. Barnett's delay in raising the zone claim thus essentially opened the door for his claim for back benefits, prejudgment interest, and attorney's fees. The Court is hesitant to reward Barnett for this delay, as raising new legal arguments in a reply brief is a disfavored practice that the Court does not wish to encourage. *See In re Rains*, 428 F.3d 893, 902 (9th Cir. 2005) (citing *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1289 n. 4 (9th Cir. 2000) (litigant failed to raise his claim properly before the district court when he did not raise the claim until his reply brief and the district court did not address the claim in its subsequent order, "undoubtedly relying on the principle that 'issues cannot be raised for the first time in a reply brief'"). Had Barnett raised the zone claim prior to the time of the reply brief, he may not have succeeded on appeal, because the Plan may have been able to articulate a reasonable basis for terminating his LTD benefits before the Court issued its first judgment.

Nevertheless, at the same time, the Court is mindful that as the result of persuading this Court of *Pannebecker*'s applicability to his scenario, Barnett has recouped essentially the same amount of money damages he would have been awarded if he had been successful on the central legal issue of whether the Plan's termination of his benefits was an abuse of discretion. As noted above, in applying *Pannebecker*, the Court determined Barnett to be eligible for back benefits from

43

the date the Plan terminated his LTD benefits until the date he turned 65 and he would have stopped receiving LTD benefits as a matter of course under the explicit terms of the Plan. Furthermore, the Court's determination regarding Barnett's eligibility for back benefits also led the Court to find him eligible for prejudgment interest and attorney's fees. Barnett's success on his claim for back benefits is therefore a substantial consideration in the Court's determination of his overall level of success. *See McCown*, 565 F.3d at 1104 (quoting *Farrar v. Hobby*, 506 U.S. 1-3, 114 (1992) ("in judging a plaintiff's level of success and the reasonableness of hours spent achieving that success, a district court should give 'give primary consideration to the amount of damages awarded as compared to the amount sought.'")). While the Court is cognizant that this consideration runs counter to the concerns raised in the previous paragraph about rewarding Barnett for raising a new legal argument in his reply brief, the Court cannot ignore Ninth Circuit precedent that mandates such consideration. *See id.*

For these reasons, the Court, in its discretion, will reduce the hours claimed by 60 percent, which is consistent with the overall mixed level of Barnett's success. *See Gonzalez*, 729 F.3d at 1200. The Court finds, specifically, that a 60 percent reduction is an appropriate reduction of the hours requested that accounts for Barnett's failure to prevail on the main legal issue in this case and allays the Court's concern regarding the delay in raising the zone issue, but does not "unfairly eliminate[e] fees reasonably incurred" with Barnett's successful claims regarding back benefits, prejudgment interest, and attorney's fees. *See Ryan*, 786 F.3d at 765; *see also Beecham v. City of West Sacramento*, No. Civ. S-07-1115 JAM EFB, 2009 WL 3824793, at *5 (E.D. Cal. Nov. 16, 2009) (imposing a 50 percent "downward adjustment for incomplete success" where "[p]laintiff's counsel significantly overvalued their achievements in the case," as the plaintiffs were successful in establishing the defendants' liability, but were only awarded $33,400 in damages rather than the $1.8 million they requested).

Finally, the Court notes that the Plan has not made any assertion[23] that the hours claimed in

---

[23] In the brief supporting its motion for summary judgment, the Plan explicitly noted that it "refrained from making lengthy arguments" regarding Barnett's claimed fee entitlement and reserved the right to make further arguments after the Court rules on the merits of the zone issue. Doc. 86-1 at 18. However, as the Plan's opposition to Barnett's motion contains a robust discussion of the Plan's legal arguments in favor of reducing Barnett's requested hours (Doc. 88 at 16-22), the Court finds that both parties have had the opportunity to brief the issue regarding the hours requested.

Rosati's timesheets are otherwise "excessive, redundant, or otherwise unnecessary." *Welch*, 480 F.3d at 946. Having carefully reviewed the timesheets, which provide a sufficient amount of detail for each task completed, and allot a reasonable number of hours per task, the Court finds that no further reduction is necessary in light of its previous determinations. Accordingly, after reducing the 358.10 hours by 60 percent, the final number of hours that Rosati can claim for the lodestar calculation is 143.24.

### iii.  Fee Enhancement

Barnett, alleging that the denial of his appeal was "based on a fundamental lie," and that "there has been an intentional exceptional delay in the payment of fees which was unjustifiably caused by [the Plan]," has requested that the Court impose a fee enhancement of double his actual fees. Doc. 85-1 at 20; Doc 89-1 at 9. The Plan argues that Barnett is not entitled to any fee enhancement because he has failed to demonstrate the "rare" or "exceptional" relief justifying such an enhancement. Doc. 88 at 20-21.

The Court agrees with the Plan. "The lodestar amount is presumptively the reasonable fee amount." *Van Gerwen*, 214 F.3d at 1045. "[A] multiplier may be used to adjust the lodestar amount upward or downward only in 'rare' and 'exceptional' cases, supported by both 'specific evidence' on the record and detailed findings by the [district] courts' that the lodestar amount is unreasonably low or unreasonably high." *Id.* (internal citations omitted). Barnett's accusations of alleged deception and bad faith by the Plan are not only unsupported by the record, but are also in poor taste. Most importantly, they fail to justify a multiplier in this case. The only case Barnett has cited, *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 556 (2010), does not support the Court's application of a multiplier in this case. In *Perdue*, the Supreme Court noted the possibility "that an enhancement may be appropriate where an attorney assumes these costs in the face of unanticipated delay, particularly where the delay is unjustifiably caused by the defense." *Id.* Here, there has been no unjustifiable delay, but only the normal course of litigation through which the Plan defended its termination of Barnett's LTD benefits. Thus, the request for enhanced fees is DENIED.

### iv.  Total Lodestar Award

The Court will GRANT IN PART AND DENY IN PART Barnett's motion for attorney's

fees. The Court declines to award attorney's fees at the rate and hours requested for the reasons

listed above, but will instead award $54,431.20 in reasonable attorney's fees for 179.05 hours at a

rate of $380 per hour. *Hensley*, 461 U.S. at 433.

### d. Reimbursement of Non-Statutory Costs

Barnett additionally seeks reimbursement of costs that would ordinarily be charged to a

client, specifically, 1) the $350 filing fee; 2) the transcript costs for the depositions of Jacobs and

Neylan, both taken on December 13, 2012, with a single bill amounting to $2,244.50; and 3)

Rosati's mileage of 520 miles at $0.56 per mile for driving to and from Edison's headquarters,

located in Rosemead, California, for the depositions, amounting to $291.20—totaling $2,885.70.[24]

Doc. 85-1 at 21; Doc. 85-2 ¶ 32. "[R]easonable out-of-pocket expenses of the kind normally

charged to clients by attorneys" are recoverable as part of reasonable attorney's fees under ERISA

and other fee-shifting statutes. *Trs. Of the Constr. Indus. & Laborers Health & Welfare Trust v.

Redland Ins. Co.*, 460 F.3d 1253, 1258 (2006). However "reasonable attorney's fees" do not

include costs that "have by tradition and statute been treated as a category of expenses distinct from

attorney's fees," and "include litigation expenses only when it is the 'prevailing practice in a given

community' for lawyers to bill those costs separately from their hourly rates.'" *Id.* (quoting *W.

Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 99-100 (1991) and *Missouri v. Jenkins by Agyei*,

491 U.S. 274, 286-77 (1989)).

The Plan, citing *Redland Ins. Co.*, contends that Barnett may not recover costs for the

depositions of Jacobs and Neylan, because these depositions had nothing to do with the zone claim

upon which Barnett obtained some success. Doc. 88 at 22. However, this contention is inconsistent

with the Court's earlier finding that Barnett's claims are interrelated. Moreover, the Court does not

read *Redland Ins. Co.* as precluding this type of expense, so long as the expense is of the type that

is ordinarily billed to clients in this community. *See* 406 F.3d at 1258. Filing fees, travel, and

depositions costs are recoverable as litigation costs in the Eastern District of California. *See, e.g.*,

*Ross v. Bar Non Enters., Inc.*, No. 2:13-cv-00234-KJM-KJN, 2015 WL 1046117 at *11 (E.D. Cal.

---

[24] Rosati erroneously calculated the amount as $2,594.50. Doc. 85-2 ¶ 32. The sum of $350, $2,244.50, and $291.20 is actually $2,885.70.

Mar. 10, 2015) (permitting reimbursement of costs requested for travel, mediation expenses, filing fees, and depositions); *Archer*, 2015 WL 9473409 at *15 (permitting reimbursement for costs related to deposition and meeting transcripts). Therefore, the Court will GRANT Barnett's request for reimbursement of these expenses in the amount of $2,885.70.

### e.  Total Award

Based on the foregoing, Barnett is entitled to attorney's fees in the amount of $54,431.20 and litigation costs in the amount of $2,885.70, for a total award of $57,316.90.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

**CONCLUSION AND ORDERS**

For these reasons, Barnett's Motion for Attorney's Fees, Back Benefits, and Interest (Doc. 85) is **GRANTED IN PART and DENIED IN PART**, and the Plan's Motion for Summary Judgment (Doc. 86) is **GRANTED**, as follows:

1. The Plan's Motion is **GRANTED** and Barnett's Motion is **DENIED** as to the "zone" issue;

2. Barnett's Motion is **GRANTED** as to back benefits; the parties are directed to meet and confer regarding the exact calculation of back benefits from October 1, 2009 to October 1, 2014, due to Barnett under the terms of the Plan and in accordance with this Order;

3. Barnett's Motion is **GRANTED IN PART AND DENIED IN PART** as to prejudgment interest, which shall be at the rate set forth in 28 U.S.C. § 1961(a); the parties are directed to meet and confer regarding the exact calculation of prejudgment interest in accordance with this Order;

4. Barnett's Motion is **GRANTED IN PART AND DENIED IN PART** as to attorney's fees; Barnett is entitled to $54,431.20 in attorney's fees;

5. Barnett's Motion is **GRANTED** as to litigation costs; Barnett is entitled to $2,885.70 in litigation costs; and

6. The Parties are directed to submit a joint proposed form of order consistent with the rulings contained herein by no later than **July 27, 2016.**

IT IS SO ORDERED.

Dated:   __July 5, 2016__              _____/s/ Lawrence J. O'Neill_____
                                       UNITED STATES CHIEF DISTRICT JUDGE